**STATE of Missouri, Respondent,**

v.

**Jessie Lee WISE, Appellant.**

No. 73648.

Supreme Court of Missouri,
En Banc.

June 21, 1994.

Modified on Denial of Rehearing
Aug. 15, 1994.

496

William J. Swift, Office of the State Public Defender, Columbia, for appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Michael J. Spillane, Asst. Atty. Gen., Jefferson City, for respondent.

COVINGTON, Chief Justice.

A jury found appellant Jessie Lee Wise guilty of first degree murder, two counts of armed criminal action, stealing, and first degree robbery, and recommended a sentence of death. The trial court sentenced appellant to death. The postconviction court overruled appellant's *Rule 29.15* motion. Appellant raises numerous points of error on appeal. This Court has exclusive appellate jurisdiction. *Mo. Const. art. V, § 3.* Affirmed.

Appellant does not challenge the sufficiency of the evidence. Viewed in the light most favorable to the verdict, the evidence shows that in 1972, appellant, at age eighteen, pled guilty to and was convicted of first degree murder. He was sentenced to life in prison. While in prison, appellant met and became friends with fellow inmate, Dexter Davis. Appellant was later released on parole.

In 1988, appellant was hired as a maintenance worker at Shaw Park Condominiums located in Clayton, Missouri. He moved on-site into one of the condominium's units. One of the tenants, Mrs. Geraldine Rose

McDonald, occasionally had appellant wash and wax her red BMW.

On the morning of August 27, 1988, appellant went to Mrs. McDonald's condominium. Mrs. McDonald let appellant inside and they discussed his washing and waxing her car. Appellant told Mrs. McDonald that he needed thirty dollars in advance. Mrs. McDonald stated that the price was too high, refused to pay, and started walking to the back of the condominium.

As Mrs. McDonald walked away, appellant removed the adjustable jaw and ring from a large pipe wrench that he used for pool maintenance. He put the adjustable jaw and ring into his pocket, walked down the hallway after Mrs. McDonald, and struck her three to four times in the back of the head, shattering her skull. Appellant took Mrs. McDonald's money, jewelry, and credit cards. He returned over the next two days to take more jewelry and Mrs. McDonald's BMW. Appellant traded some of the jewelry for cocaine, gave some of it to his wife, and, with the help of Dexter Davis, pawned the rest.

Mrs. McDonald's husband and two daughters found her body on Monday night, August 29, 1988, lying face down in a pool of blood in the doorway to the master bedroom; blood splatters covered the walls and ceiling. The body was nude from the waist down. Many of the drawers in the bedroom were open, with several jewelry boxes on the floor. The pipe wrench was on a chair next to the body.

On August 30, police decided to question appellant. About one block away from his residence of record at 4113 Flad, they found Mrs. McDonald's parked BMW. When they met appellant in a neighbor's apartment, he initially gave the name Oscar. Upon leaving the apartment, appellant asked his stepson to retrieve his cigarettes, shoes, and jacket. When police accompanied the stepson to an upstairs apartment, they found Mrs. McDonald's car keys on a bedroom table. Inside appellant's jacket pocket they recovered Mrs. McDonald's credit cards. During an inventory search, they recovered a pawn ticket from the Easton Loan Company. At the Easton Loan Pawn Shop police eventually recovered Mrs. McDonald's jewelry.

At the police station, appellant gave an oral statement. He told police that on Friday or Saturday, he went to Mrs. McDonald's apartment to get an advance for washing and waxing her BMW. She became upset over his stated fee and began to walk down the hallway. At that point, appellant said that he felt desperate and he needed money and was not leaving without something. Appellant admitted using the pipe wrench to kill Mrs. McDonald. He stated that he removed the adjustable jaw and ring before he struck her in the back of the head with the wrench at least three times.

Appellant described how he tried to move the body because he thought Mrs. McDonald was still breathing. He then described how he took her condominium key and money and then left to buy cocaine. Finally, he described how he returned the next day and took the jewelry. He then drove away in Mrs. McDonald's BMW and tried to trade the jewelry for cocaine. He admitted returning to the apartment a third time, on Sunday, for more jewelry. He said he traded some jewelry for cocaine and also gave some jewelry to his wife.

Appellant's fingerprints were found on the jewelry boxes in the condominium and on the BMW. Police recovered one of Mrs. McDonald's rings from appellant's wife.

At trial appellant testified that he had been intimately involved with Mrs. McDonald. He denied killing her, but admitted stealing the jewelry.

Additional facts are presented where relevant.

## SUPPRESSION OF EVIDENCE ISSUES

Appellant asserts that the police violated his Fourth Amendment rights, applied to Missouri through the Fourteenth Amendment, because they did not have an arrest or search warrant when they arrested him and seized evidence. Appellant also asserts that, because of cocaine intoxication, he was incapable of knowingly and intelligently waiving his *Miranda* rights. He contends, therefore, that the trial court erred in overruling his

pretrial motion to suppress the seized evidence and confession.

■ Appellate review of motions to suppress is limited to a determination of whether sufficient evidence exists to sustain a trial court's holding. *State v. Blair*, 691 S.W.2d 259, 260 (Mo. banc 1985), *cert. granted*, 474 U.S. 1049, 106 S.Ct. 784, 88 L.Ed.2d 762 (1986), *cert. dismissed*, 480 U.S. 698, 107 S.Ct. 1596, 94 L.Ed.2d 678 (1987). The record of the suppression hearing supports the following factual account. During the investigation of Mrs. McDonald's murder, the police learned that appellant worked as the condominium's maintenance worker and that he had not been seen for two or three days. In the condominium's locked tool storage area, police found an adjustable jaw and ring that appeared to be the missing parts of the murder weapon. The condominium's manager informed police that appellant had the only other key to the tool area. A police computer check revealed appellant's previous murder conviction. The computer check reported appellant's address as 4113–A Flad. Around noon on Tuesday, August 30, Clayton police officers decided to check out the address. The officers found Mrs. McDonald's BMW parked approximately one block from the Flad address.

The building at the Flad address contains two apartment units, one at ground level, the other upstairs. Each unit has its own entry door facing a small front porch. Upon arrival at the apartment building, the officers encountered ten-year-old Angela Crawford standing on the front porch in the open doorway of the downstairs unit. Angela told the officers that appellant sometimes stayed in the upstairs unit, but that he did not live there. She told the police that appellant was using her telephone in the downstairs unit. Through the open doorway to the downstairs apartment unit, police saw appellant in the hallway using the telephone. The police followed Angela inside as she pointed out the appellant. Appellant "stopped dead" when he saw the police. He identified himself as Oscar when questioned, but revealed that he was Jessie Lee Wise when police demanded identification. The officers placed him under arrest and read him the *Miranda* warnings,

but did not question him while at the apartment.

As officers led appellant onto the front porch, he asked his fourteen-year-old stepson, Arbra Martin, to go to the upstairs apartment unit and get his shoes, coat, and cigarettes. Arbra told the police to come with him and that he would give the police the requested items. Arbra told the police that appellant did not live in the upstairs apartment, but that he occasionally visited. Arbra stated that appellant had last stayed at the upstairs apartment over the weekend.

Police followed Arbra into the upstairs apartment unit and proceeded with him to a bedroom. Arbra entered the bedroom to retrieve appellant's shoes and coat. An officer waiting in the bedroom's doorway seized a set of BMW keys that he noticed on a bedroom table. Arbra handed appellant's jacket to a detective who searched the pockets, finding Mrs. McDonald's credit cards. Police asked Arbra if appellant had brought any jewelry into the apartment. Arbra said that he had and gave the officers a small gold chain from the bedroom dresser. During a routine inventory search the police found pawn tickets in appellant's wallet. Police went to the pawn shops with the tickets and found more of Mrs. McDonald's jewelry.

Appellant does not challenge the police's probable cause to arrest. Instead, he asserts that because the police did not have an arrest or search warrant to enter the downstairs apartment unit, the arrest violated the Fourth Amendment. He also asserts that the evidence found in the upstairs apartment unit was illegally seized.

■ In *Jones v. United States*, 362 U.S. 257, 267, 80 S.Ct. 725, 734, 4 L.Ed.2d 697 (1960), the United States Supreme Court held that criminal defendants who were "legitimately on the premises" have standing to challenge Fourth Amendment violations. Eighteen years later, in *Rakas v. Illinois*, 439 U.S. 128, 142, 99 S.Ct. 421, 429, 58 L.Ed.2d 387 (1978), the Court explicitly overruled the *Jones* test for Fourth Amendment standing as being "too broad a gauge." The *Rakas* Court stated that Fourth Amendment rights are personal rights that may not be

vicariously asserted. *Id.* at 138–40, 99 S.Ct. at 427–29. To have standing to assert Fourth Amendment violations, a defendant must demonstrate a legitimate expectation of privacy in the premises. *Id.* at 148, 99 S.Ct. at 432.

■ The issue is whether appellant demonstrated a legitimate expectation of privacy in the downstairs apartment unit in order to have Fourth Amendment standing to challenge the warrantless arrest. The United States Supreme Court held in *Payton v. New York,* 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980), that because people have a legitimate expectation of privacy in their homes, the Fourth Amendment requires police to have an arrest warrant to arrest criminal suspects in their home. In *Minnesota v. Olson,* 495 U.S. 91, 110 S.Ct. 1684, 109 L.Ed.2d 85 (1990), the Court expanded *Payton,* holding that an overnight guest has an expectation of privacy in his host's home that society is willing to recognize as reasonable and, therefore, has standing to assert Fourth Amendment violations.

Appellant does not have Fourth Amendment standing under *Payton* or *Olson.* Testimony at the suppression hearing showed that appellant lived at the Shaw Park Condominium, not at the Flad address. Although appellant occasionally spent the night with his wife in the Flad building's upstairs apartment unit, there is no evidence that he ever spent the night in the downstairs apartment unit. Appellant was in the downstairs apartment unit merely to use the telephone. The rationale supporting a legitimate expectation of privacy in overnight guests does not apply to one occupying another's apartment to make a telephone call.[1] Appellant failed to demonstrate a legitimate privacy interest in

the downstairs apartment unit; he does not, therefore, have standing to assert any Fourth Amendment violation in the police's warrantless entrance into the apartment to arrest him.

Because police effected a valid, constitutional arrest, the seizures of evidence cannot be fruit of an unlawful arrest. Appellant contends that the seizures were nonetheless unconstitutional because police did not have a search warrant to enter and search the upstairs apartment unit. Appellant occasionally spent the night with his wife in the upstairs apartment unit and had spent the weekend with her prior to the arrest. Appellant assumes that he had a legitimate expectation of privacy in the upstairs apartment under *Minnesota v. Olson,* 495 U.S. 91, 110 S.Ct. 1684, 109 L.Ed.2d 85 (1990). Assuming, without deciding, that appellant did have a legitimate expectation of privacy in the upstairs apartment, appellant's assertion that a search warrant was required is without merit. All of the evidence was seized under various exceptions to the warrant requirement.

The United States Supreme Court, in *Washington v. Chrisman,* 455 U.S. 1, 6, 102 S.Ct. 812, 816, 70 L.Ed.2d 778 (1982), held that under the Fourth Amendment police may accompany an arrestee, "at his elbow," if the arrestee is allowed to retrieve items in areas that would otherwise be protected from a warrantless search. In *State v. Payano,* 528 A.2d 721 (R.I.1987), the Supreme Court of Rhode Island extended *Chrisman's* rationale to allow police to accompany a third party sent to retrieve items for an arrestee. The *Payano* court held that the Fourth Amendment did not bar police without a warrant from following a woman into the

---

1. In discussing the rationale behind an overnight guest's legitimate expectation of privacy, the United States Supreme Court stated:

> To hold that an overnight guest has a legitimate expectation of privacy in his host's home merely recognizes the everyday expectation of privacy that we all share.... 
>
> From the overnight guest's perspective, he seeks shelter in another's home precisely because it provides him with privacy, a place where he and his possessions will not be disturbed by anyone but his host and those his host allows inside. We are at our most vulner-

able when we are asleep because we cannot monitor our own safety or the security of our belongings.

*Minnesota v. Olson,* 495 U.S. 91, 98–99, 110 S.Ct. 1684, 1689, 109 L.Ed.2d 85 (1990). A person occupying another's home to make a telephone call does not share these privacy expectations. Although the telephone user certainly expects his telephone call to be private, he cannot legitimately expect that the homeowner will share with him the level of privacy in the home itself that an overnight guest appropriately expects.

arrestee's bedroom as she retrieved his shoes. *Id.* at 726–27. Once in the bedroom, the police were authorized to seize evidence under the plain view doctrine. *Id.* at 727; *cf. State v. Griffin,* 336 N.W.2d 519 (Minn.1983) (holding that the Fourth Amendment does not bar police from entering arrestee's room to retrieve his shoes and coat when it was snowing outside, and, once in arrestee's room, police were authorized to seize evidence under the plain view doctrine).

■ The compelling interest in police safety that allows police to follow at the elbow of an arrestee as he is allowed to move around, *Chrisman,* 455 U.S. at 7, 102 S.Ct. at 817, also applies where a third party is sent to retrieve items for an arrestee. As the *Payano* court stated, police "did not know whether anyone else might be in the bedroom or whether a weapon had been placed therein.... It was only by the exercise of such caution that the police could assure themselves that the woman would not emerge with a weapon rather than a pair of shoes." *Payano,* 528 A.2d at 727.

■ Under the reasoning of *Payano,* the police did not need a warrant to follow Arbra Martin into the upstairs apartment unit as he retrieved appellant's shoes, coat, and cigarettes. Once legally in the upstairs apartment, police properly seized the BMW keys under the plain view doctrine. *See State v. Blankenship,* 830 S.W.2d 1, 14 (Mo. banc 1992). The police properly seized the jewelry after Arbra handed it to them. Arbra also handed the police the jacket containing Mrs. McDonald's credit cards. The police were entitled to ensure their own safety by searching the jacket before giving it to appellant; therefore, the credit cards were also properly seized. *See United States v. Robinson,* 414 U.S. 218, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973); *Chimel v. California,* 395 U.S.

752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969) (police entitled to search areas within immediate control of an arrestee). The pawn tickets were properly seized after police found them in appellant's wallet during a routine inventory search. *Illinois v. Lafayette,* 462 U.S. 640, 103 S.Ct. 2605, 77 L.Ed.2d 65 (1983); *State v. Friend,* 711 S.W.2d 508, 510 (Mo. banc 1986). The trial court properly admitted the credit cards, jewelry, BMW keys, and pawn tickets.

Appellant also argues that the trial court erred in overruling his motion to suppress his confession to the police. Appellant first contends that his confession was a fruit of an illegal arrest and search. Because the arrest and seizure of evidence were constitutional, appellant's argument fails.

■ Appellant next argues that cocaine intoxication rendered him incapable of knowingly and intelligently waiving his right to silence; therefore, his confession should have been suppressed.[2] Appellant does not assert that his confession was involuntary, and there are no indications or allegations of police coercion.

■ Appellant's argument is not supported by the record. A knowing and intelligent waiver of the right to silence is normally shown by having a police officer testify that he read the accused his rights, asked whether the rights were understood, and received an affirmative response. *State v. Schnick,* 819 S.W.2d 330, 335–36 (Mo. banc 1991); David M. Nissman, et al., *Law of Confessions* § 6.5, at 157 (1985). Here, police informed appellant of his constitutional rights by giving the *Miranda* warnings when they arrested him and twice before interrogating him. As police read each right aloud, appellant orally responded that he understood the right. Appellant also signed his initials next to each right on a waiver form indicating that

---

**2.** Alternatively, appellant argues that because the trial court did not explicitly find that he made a knowing and intelligent waiver of the right to silence, the Court should remand for such a finding if it cannot fully consider the claim. A trial court is not required to perform a precise recital of findings when it overrules a motion to suppress a confession. *State v. Mease,* 842 S.W.2d 98, 105 (Mo. banc 1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 2363, 124 L.Ed.2d 269

(1993); *State v. Schnick,* 819 S.W.2d 330, 336 (Mo. banc 1991). At the suppression hearing the parties argued whether the cocaine rendered appellant incapable of waiving his *Miranda* rights. Implicit in the trial court's ruling that the confession was admissible is that the trial court found that appellant had made a knowing and intelligent waiver of the right to silence. *See State v. Scott,* 841 S.W.2d 787, 789 (Mo.App.1992).

he understood the rights. Appellant refused, however, to sign his name at the bottom of the waiver form where it states: "I have read and understand all my rights. I voluntarily waive my rights and desire to make a statement." When asked why he would not sign at the bottom of the form, appellant responded that it was not necessary for him to sign. Appellant never indicated that he did not understand his rights or that he did not want to talk to the police. Sufficient evidence exists for the trial court to have found that appellant made a knowing and intelligent waiver of the right to silence.

Appellant argues that there was evidence at the suppression hearing that he was using large amounts of cocaine in the two week period prior to his arrest, that he had little sleep during that period, and that he was intoxicated on cocaine at the time of the confession. During the interrogation, appellant told police that he was having difficulty remembering the weekend's events. He also testified at the hearing that he was able to recall very little of what occurred during the police interrogations. The defense's expert opined that appellant was suffering from cocaine delirium when interrogated, which impaired his ability to make judgments. Police testified that appellant appeared tired, but alert, and did not appear high on drugs. Appellant's own witnesses testified that he was not acting unusual or as if he was high on drugs when police arrested him.

■ It is a trial court's duty to weigh evidence and witness credibility. *State v. Battle*, 661 S.W.2d 487, 491 (Mo. banc 1983), *cert. denied*, 466 U.S. 993, 104 S.Ct. 2375, 80 L.Ed.2d 847 (1984). There is sufficient evidence to support the trial court's finding of a knowing and intelligent waiver of the right to silence: the court could have believed the police officer's testimony, viewed the *Miranda* waiver form that was initialed by appellant, and discounted appellant's testimony and that of his expert witness.[3]

### MENTAL COMPETENCY ISSUES

■ Appellant's expert opined that appellant was not competent to stand trial or to act as his own attorney. The court granted the state's request, pursuant to § 552.020.6, RSMo 1986,[4] for an additional mental examination by an expert of its choice. Appellant asserts that forcing him to submit to the state's examination violated his Fifth Amendment right against self-incrimination.

■ Ordering a criminal defendant to submit to a psychiatric examination to determine whether the defendant is mentally competent to stand trial does not involve incrimination. Criminal defendants must be mentally competent to stand trial, *Dusky v. United States*, 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960), but mental competence does not constitute an element of any of the crimes charged. Section 552.030.5, RSMo Supp.1993, protects the right against self-incrimination by excluding any incriminating statements that a criminal defendant may make during a mental examination.

In addition to the fact that competency examinations are nonincriminating, when a criminal defendant asserts incompetence to stand trial, he waives the right to object to a mental examination. *See State v. Carter*, 641 S.W.2d 54, 57 (Mo. banc 1982) (criminal de-

---

3. Appellant's expert's opinion that cocaine intoxication impaired appellant's *judgment* is irrelevant so long as there was no police coercion and appellant realized that anything he said could be used against him. *See Colorado v. Connelly*, 479 U.S. 157, 161–62, 107 S.Ct. 515, 518–19, 93 L.Ed.2d 473 (1986) (upholding a confession where the confessor's *judgment* was impaired by "command hallucinations" that ordered him to confess, but where confessor's cognitive abilities were not significantly impaired and where he understood that he had the constitutional right to remain silent). The requirement of a knowing and intelligent waiver of the right to silence does not mean that an accused must make an intelligent waiver decision, for one can argue that it is

never a strategically good decision to confess to a crime. Rather, the requirement of knowing and intelligent waiver simply means that an accused must be made aware of the consequences of his actions; he must be made aware that anything he says can be used against him in court. Here, appellant's expert opined that cocaine impaired appellant's judgment. The expert did not opine that *appellant's cognitive skills were impaired* to the point that he was incapable of understanding that whatever he said to the police could be used against him in court.

4. All statutory references are to RSMo 1986, unless otherwise indicated.

fendants who plead insanity waive the privilege of self-incrimination as it relates to their competency), *cert. denied,* 461 U.S. 932, 103 S.Ct. 2096, 77 L.Ed.2d 305 (1983); *State v. Swinburne,* 324 S.W.2d 746, 750 (Mo. banc 1959) (criminal defendants who put their sanity at issue waive the privilege against self-incrimination to exclude testimony of doctors who have conducted a competency examination). Appellant's claim is without merit.

 Appellant also asserts that he was not competent to stand trial or to represent himself at trial. A defendant is competent to stand trial if he has "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding" and has "a rational as well as factual understanding of the proceedings against him." *Dusky v. United States,* 362 U.S. 402, 402, 80 S.Ct. 788, 788, 4 L.Ed.2d 824 (1960) (per curiam); *accord Drope v. Missouri,* 420 U.S. 162, 171, 95 S.Ct. 896, 903, 43 L.Ed.2d 103 (1975) (a criminal defendant must have the "capacity to understand the nature and object of the proceedings against him, to consult with counsel, and to assist in preparing his defense"). "Requiring that a criminal defendant be competent has a modest aim: It seeks to ensure that he has the capacity to understand the proceedings and to assist counsel." *Godinez v. Moran,* — U.S. —, —, 113 S.Ct. 2680, 2688, 125 L.Ed.2d 321 (1993). The level of competency required to waive the constitutional right to counsel is the same level of competency required to stand trial. *Id.* — U.S. at —, 113 S.Ct. at 2686.

Appellant was a thirty-five-year-old with an associate degree from a junior college. Two judges had substantial opportunity to observe appellant during pretrial proceedings and at trial. Three experts examined him to determine whether he was competent: two experts found appellant competent, one found him incompetent. According to one of the expert's report:

Mr. Wise clearly understands the charges pending against him and the seriousness of them. He understands the consequences if found guilty and seems to have a good idea of how he wants to proceed in order to defend himself. Having undergone such procedures in the past, Mr. Wise seems to be quite well versed in the procedures and functions. His ability to recall does not seem to be impaired. His behavior is appropriate. Thus, overall, he is competent to proceed at this time.

The court found appellant mentally competent based upon the experts' reports, personal observations of appellant and his numerous pro se pleadings,[5] and appellant's strenuous objection to the competency hearings and insistence that he was sane and fully competent. Appellant represented himself during the guilt phase of trial with two standby counselors present. At the close of the trial, the court commented that appellant had done an excellent job of representing himself. Sufficient evidence exists to support the finding that appellant was competent to stand trial and to waive the right to counsel.

 Appellant's next point relates to appellant's standby counsel's filing a sealed, *ex parte* motion requesting that appellant's competency hearing be conducted without the prosecutor present and with the courtroom closed to spectators. The motion contained a detailed outline of appellant's behavior, including trial strategy, which caused standby counsel to believe that appellant was suffering from a mental disease manifested by paranoia. The court held competency hearings, but overruled the motion for *ex parte* hearings. Appellant asserts confidential communications, including his trial strategy, were disclosed because the court did not sustain the motion for *ex parte* competency hearings. Appellant contends that courts must hold *ex parte* competency hearings where standby counsel asserts that a pro se

---

5. The court found, based upon its substantial observation of appellant at numerous pretrial hearings, that: (a) defendant was coherent and rational at all appearances; (b) defendant demonstrated a knowledge and understanding of each portion of the trial; (c) defendant demonstrated a knowledge of the factual allegations against him; (d) defendant demonstrated an understanding of the roles of his attorney, the judge and the prosecuting attorney; and (e) defendant demonstrated an ability to consult with his attorney and, in fact, had requested that his attorneys perform research and investigation.

criminal defendant's trial strategy is evidence of mental incompetence.[6]

Appellant cites no pertinent authority that holds the state may be denied an opportunity to cross-examine witnesses and to present opposing evidence in a competency hearing. To the contrary, § 552.020.7 provides:

> If any such opinion is contested, the court shall hold a hearing on the issue. The report or reports may be received in evidence at any hearing on the issue but the party contesting any opinion therein *shall* have the right to summon and to cross-examine the examiner who rendered such opinion and to offer evidence upon the issue.

§ 552.020.7 (emphasis added). Courts need not grant *ex parte* competency hearings where standby counsel asserts that a pro se criminal defendant's trial strategy evidences mental incompetence. Appellant's point is denied.

Appellant asserts for the first time on appeal that the trial court erred in not reopening the competency hearings. Standby counsel filed a motion to reopen the competency hearings less than two weeks after the court ruled that appellant was competent. Standby counsel asserted as new evidence of appellant's incompetence the following contentions: (1) appellant objected to the competency hearings and proposed findings in support of ruling that he was competent; (2) appellant had moved to dismiss standby counsel; and (3) appellant had filed a bar complaint against standby counsel.

Appellant's first contention fails because appellant had asserted his competence from the outset of the competency proceedings. In addition, any allegations of incompetence derived from the substance of the filing are not new because the trial court received the filing two months prior to its ruling of competence. The second contention fails because standby counsel had made similar allegations in its sealed motion for an *ex parte* competency hearing. The third contention, although new, does not evidence incompetence.

Appellant also asserts that the court should have reopened the competency hearings *sua sponte* because of alleged deficiencies in trial tactics and trial mistakes. Appellant cites *Drope v. Missouri*, 420 U.S. 162, 180, 95 S.Ct. 896, 908, 43 L.Ed.2d 103 (1975), for the proposition that a court must conduct an inquiry when events create a sufficient doubt as to a criminal defendant's competence.

Appellant's point fails. A pro se criminal defendant's mistakes in trial tactics, regardless of how blatant or fundamental they may seem to a trained attorney, do not necessarily demonstrate mental incompetence. The competence required to proceed effectively pro se is not the same level of mental competence the constitution requires to be criminally tried or to waive the right to counsel. *Godinez v. Moran*, — U.S. —, —, 113 S.Ct. 2680, 2687, 125 L.Ed.2d 321 (1993). As stated by the United States Supreme Court in *Godinez*:

> [A] defendant's "technical legal knowledge" is "not relevant" to the determination whether he is competent to waive the right to counsel ... although the defendant "may conduct his own defense ultimately to his own detriment, his choice must be honored." Thus, while "[i]t is undeniable that in most criminal prosecutions defendants could better defend with counsel's guidance than by their own unskilled efforts," a criminal defendant's ability to represent himself has no bearing upon his competence to *choose* self-representation.

*Id.* — U.S. at —, 113 S.Ct. at 2687 (citations omitted). As noted above, the trial judge stated on the record at the end of the trial that appellant had done an excellent job representing himself at trial. The record supports the trial court's view. Review of appellant's alleged mistakes in trial tactics does not demonstrate that appellant lacked understanding of the proceedings against

---

**6.** If a pro se criminal defendant's trial strategy truly evidences mental incompetence, no harm should result in its disclosure.

him or that he was unable to assist in his defense.

## ISSUES SURROUNDING DEXTER DAVIS

■ Dexter Davis helped appellant pawn Mrs. McDonald's jewelry. After police arrested him, Davis gave a videotaped statement incriminating appellant. The tape was lost and not recovered until approximately twenty-two months after appellant's trial. Appellant asserts that the court erred in overruling his motion to compel disclosure of the videotape and to suppress Davis's in-court testimony because he did not have an opportunity to view the videotape and that it was essential to impeach Davis.

On the state's motion while the case was pending on appeal, this Court remanded for the trial court's determination of whether nondisclosure of the videotape violated *Brady v. Maryland*, 373 U.S. 83, 87, 83 S.Ct. 1194, 1196, 10 L.Ed.2d 215 (1963), which holds that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." Upon the state's motion, the trial court also ruled on whether a crime-scene videotape that was also lost and recovered after trial violated *Brady*.

■ The motion court found that the videotapes were not material to either appellant's guilt or punishment. Evidence is material if there is a "reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Pennsylvania v. Ritchie*, 480 U.S. 39, 57, 107 S.Ct. 989, 1001, 94 L.Ed.2d 40 (1987). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* The court found the videotapes immaterial based upon the fact that appellant was aware that Davis had made a videotaped statement to the police; that he possessed the police report relative to Davis's anticipated testimony; that he examined Davis in great detail in pretrial depositions; and that both videotapes were basically duplicative. The court found that there was no reasonable likelihood that the videotape's nondisclosure affected the jury's verdict.

The motion court was correct in finding that nondisclosure of the videotapes did not violate *Brady*. In addition to the reasons given by the trial court to support its finding, the record shows that appellant elicited from Davis on cross-examination that he was angry with appellant because he felt appellant was responsible for his arrest and subsequent job loss. Appellant also inquired into deals that Davis may have made with the police for Davis's testimony. In sum, there is not a reasonable probability that appellant would have been acquitted had Davis's testimony been excluded. Without Davis's testimony, the jury had evidence that: (1) appellant confessed to the murder; (2) appellant was found in possession of Mrs. McDonald's car, jewelry, and credit cards; (3) appellant's fingerprints were found on Mrs. McDonald's jewelry cases and car; (4) the murder weapon was a wrench that appellant used in his job and the missing parts to the wrench were found locked in a tool shed to which he had the only key other than the condominium's manager's; and (5) a witness saw appellant outside Mrs. McDonald's condominium shortly before the murder and heard a treacherous scream shortly thereafter. The court on remand did not err in ruling that nondisclosure of the videotapes did not violate *Brady*.[7]

■ Appellant next asserts that the trial court erred in sustaining the state's objection to his inquiry regarding pending criminal

---

7. Appellant raises additional issues regarding the remand hearing that do not merit a lengthy discussion. First, the court did not err in ruling on whether the crime-scene videotape violated *Brady* because the issue fell within the scope of determining whether *Brady* had been violated. Second, the court did not err in refusing to expand the scope of remand to consider standby counsel's ineffectiveness because that issue did not relate to the purpose of remand. Third, the

court did not err in refusing to grant a continuance because appellant's offer of proof showed that the testimony of the unavailable witnesses was duplicative. Finally, Judge Wiesman did not err in refusing to disqualify himself or in refusing to let another judge hear the motion to disqualify because appellant failed to provide any evidence that Judge Wiesman was biased or prejudiced against him.

charges against Davis that arose after Mrs. McDonald's murder. Appellant asserts that inquiry into the pending charges was necessary to demonstrate Davis's possible motivation for testifying favorably for the state.

■ Appellant's assertions are unsupported. Generally, witness credibility may not be impeached by showing "a mere arrest, investigation, or criminal charge which has not resulted in a conviction." *State v. Sanders*, 360 S.W.2d 722, 725 (Mo.1962). In *State v. Lockhart*, this Court stated three exceptions to the general rule: (1) where the inquiry demonstrates a specific interest of the witness; (2) where the inquiry demonstrates the witness' motivation to testify favorably for the state; or (3) where the inquiry demonstrates that the witness testified with an expectation of leniency. *State v. Lockhart*, 507 S.W.2d 395, 396 (Mo.1974); *State v. Watts*, 813 S.W.2d 940, 943 (Mo.App.1991).

■ Here, appellant attempted to show that four "wanteds" [8] had been issued against Davis to show that Davis was biased towards the state. Appellant failed, however, to establish the required nexus between the "wanteds" and Davis's testimony so as to satisfy the *Lockhart* exceptions. *See Watts*, 813 S.W.2d at 943. A party need not establish that the state made a deal or a promise in exchange for a witness' testimony, but must demonstrate the witness' "perception of expectancy of favorable treatment if he furthers the state's case, or his basis to fear harsh treatment if his testimony is unfriendly." *State v. Joiner*, 823 S.W.2d 50, 54 (Mo. App.1991). Appellant failed to show that Davis was even aware of the "wanteds," nor is there evidence that Davis was ever arrested on the "wanteds" or that any arrest resulted in pending charges. In addition, the prosecutor denied any connection between the "wanteds" and Davis's testimony and stated that no deals or promises had been exchanged for Davis's testimony. The court correctly sustained the state's objection to appellant's attempt to show Davis's "wanteds."

## ISSUES RELATED TO APPELLANT'S THEORY OF DEFENSE

■ Appellant asserts that the trial court erred in making various rulings that prohibited him from pursuing the trial strategy that Mr. McDonald, not he, murdered Mrs. McDonald. Appellant presented no evidence that Mr. McDonald committed an act directly connecting him to the crime. Rather, appellant sought to show that Mr. McDonald had a motive and opportunity to murder Mrs. McDonald. The trial court correctly ruled. A criminal defendant may not introduce evidence that another person had an opportunity or motive to commit the crime charged without proof that the other person "committed some act directly connecting him with the crime." *State v. Schaal*, 806 S.W.2d 659, 669 (Mo. banc 1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 976, 117 L.Ed.2d 140 (1992); *State v. Easley*, 662 S.W.2d 248, 251–52 (Mo. banc 1983).

■ Appellant, perhaps anticipating that the ruling of *Schaal* would apply, argues that the trial court's denial of his request for *in camera* review of Mrs. McDonald's former attorney's divorce files precluded his making direct connection of Mr. McDonald to the crime. His argument is without merit. The attorney's divorce files may have contained evidence of motive, but it is unreasonable to assume that Mrs. McDonald's attorney's divorce files would contain proof that Mr. McDonald committed an act directly connecting him to Mrs. McDonald's murder.

Finally, appellant asserts that the Court should abrogate the rule excluding evidence of another's opportunity or motive. Appellant analogizes to *State v. Waller*, 816 S.W.2d 212, 214 (Mo. banc 1991), where this Court abrogated the evidentiary rule that prevented defendants who asserted self-defense from introducing "evidence of the victims' specific acts of violence having no connection with the defendant." Appellant argues that just as evidence of a victim's prior violent acts directed at someone other than the defendant is relevant to a theory of self-de-

---

8. Appellant failed to define the term "wanteds." It appears from the record to be a colloquialism for something other than a warrant.

fense, so too is evidence of Mr. McDonald's motive and opportunity to kill Mrs. McDonald relevant to appellant's theory that Mr. McDonald was responsible for the murder.

 Appellant's analogy fails. The defendant in *Waller* sought to establish the defense of self-defense. A defendant asserting self-defense must have reasonably believed that he was subject to an imminent attack. *Id.* at 215. A defendant's perception of the victim is critical; therefore, evidence bearing on a defendant's perception is relevant. *Id.* Conversely, evidence that another had an opportunity or motive to commit the crime charged is, without more, not relevant to any issue involved. "Evidence that one person had an opportunity to commit the crime would not exculpate defendant, who also had the opportunity, and committed the crime." *State v. Miller*, 368 S.W.2d 353, 360 (Mo.1963) (citing *State v. Yandle*, 166 Mo. 589, 66 S.W. 532, 534 (1902)). The rationale applies with equal force to evidence of another's motive to commit the crime charged. Criminal defendants offer evidence of another person's opportunity and motive to raise doubts of their guilt by casting suspicion on another. Because of the high tendency of such evidence to confuse and misdirect attention from the issues of the case, courts allow the evidence only where the defendant is able to tie the evidence to proof that the other person committed an act directly connecting him with the crime. *Schaal*, 806 S.W.2d at 669. Appellant's claims are denied.

## JURY ISSUES

 Appellant asserts that the trial court abused its discretion in not sustaining his motion to strike venireperson Lay for cause. Mr. Lay was formerly employed as a Clayton police officer and at the time of trial did some computer contract work for the St. Louis City and County Police Departments. The following colloquy occurred during voir dire between venireperson Lay and the prosecutor.

*VENIREPERSON LAY:* In 1968 I was a Clayton police officer for about two years.

*MR. ROSS:* Mr. Lay, so I guess that's been 20 some years ago?

*VENIREPERSON LAY:* Right, 22.

*MR. ROSS:* Do you still know any of the Clayton police officers or do you—is that in contact with?

*VENIREPERSON LAY:* There's not many there. I would say there's a good chance there may still be someone there, yes. Who it would be, I couldn't tell you.

*MR. ROSS:* So you have not been in touch with anyone in many years?

*VENIREPERSON LAY:* No.

*MR. ROSS:* Okay. Is there anything about that experience that would interfere with your ability to be a fair and impartial juror in this case?

*VENIREPERSON LAY:* Not at all. I don't think so.

*MR. ROSS:* When you were with Clayton Police Department, did you ever get involved in a murder investigation?

*VENIREPERSON LAY:* No.

*MR. ROSS:* What kind of work did you do at that point in time?

*VENIREPERSON LAY:* At that point in time, I was fairly new so I was doing the menial tasks of the police officers, street duty and some of the things that you do before you get into the bigger situations.

*MR. ROSS:* So you were never involved in the investigation or handling of a case like this?

*VENIREPERSON LAY:* No.

*MR. ROSS:* Do you feel that you could put that aside and base your judgment solely upon the evidence as you hear it from the witness stand?

*VENIREPERSON LAY:* Yes. My background for the past 22 years has been in computers and I have done some computer work for St. Louis County Police and St. Louis City Police, a fair number of years with both.

*MR. ROSS:* Doing that work, I assume you will come in contact more with their computer people as opposed to the—

*VENIREPERSON LAY:* Just about, strictly.

MR. ROSS: Is there anything about that that would interfere with your ability to be fair and impartial?

VENIREPERSON LAY: No, not at all.

MR. ROSS: The Clayton Police Department was involved in the investigation of this case along with St. Louis City Police. The fact that you would be hearing from Clayton police officers, would that—would you be able to weigh their testimony just as you would any other witness?

VENIREPERSON LAY: Certainly.

MR. ROSS: Okay. So you would not necessarily give them greater credence than you would any other witness; is that correct?

VENIREPERSON LAY: No.

MR. ROSS: Okay. Thank you very much, Mr. Lay.

Appellant exercised one of his nine peremptory challenges to remove Mr. Lay from the jury pool.

 Trial court judges observe potential jurors' responses, demeanor, and attitude during voir dire, enabling them to assess credibility. They are, therefore, afforded broad discretion in determining whether to strike a venireperson for cause. *State v. Hopkins*, 687 S.W.2d 188, 189 (Mo. banc 1985). A reviewing court will not disturb a trial court's ruling unless the record reflects a "clear abuse of discretion and a real probability of injury to the complaining party." *State v. Burgess*, 800 S.W.2d 743, 746 (Mo. banc 1990).

 Past employment with law enforcement does not, standing alone, constitute grounds for striking a venireperson for cause. *State v. Hall*, 612 S.W.2d 782, 785 (Mo.1981); *State v. Merritt*, 735 S.W.2d 399, 403 (Mo.App.1987); *State v. Ruff*, 729 S.W.2d 556, 558 (Mo.App.1987). Cause exists where such employment combines with other factors, such as juror responses to voir dire questioning, to indicate a bias or a lack of

impartiality. *State v. Hopkins*, 687 S.W.2d 188, 190 (Mo. banc 1985). Here, Mr. Lay unequivocally stated that his past police employment and current computer contracting work with police authorities would not impair his ability to be fair and impartial, that he could judge the case based upon the evidence presented, and that he would not view police testimony as being more credible. The trial court did not abuse its discretion in overruling the motion to strike venireperson Lay for cause.[9]

 Appellant also asserts that the trial court erred in not replacing juror Kinsey with one of the available, alternate jurors. During trial, juror Kinsey interrupted the proceedings to disclose that she knew the victim's daughter. The following side-bar colloquy occurred between the court, juror Kinsey, and the prosecutor.

VENIREPERSON KINSEY: No. I need to speak to someone. I think I might have a conflict here.

THE COURT: Counsel approach the bench please and then, ma'am come forward.

[Counsel approached the bench, and the following proceedings were had out of the hearing of the jury:]

VENIREPERSON KINSEY: I think I may know the victim's daughter.

THE COURT: One moment please. Mary Kinsey?

VENIREPERSON KINSEY: I think I may know the victim's daughter. The name didn't hit me earlier until you started saying about—

THE COURT: Who would that be?

VENIREPERSON KINSEY: Her name would be Kathy Wilson. Did she have a daughter named Kathy?

THE COURT: Do you know?

MR. ROSS: There is a daughter by the name of Kathy Wilson.

---

9. Prior to legislative amendment in 1993, §§ 546.150 and 546.180 gave defendants the right to have a full panel of qualified jurors from which to make peremptory strikes. *See State v. Schnick*, 819 S.W.2d 330, 334 (Mo. banc 1991) (inviting the legislature to change the law). It

was reversible error if a court erroneously failed to strike a juror for cause even if the defendant used a peremptory strike to remove the juror. *Id.* Under the new amendment, it is error only if the venireperson is part of the jury. *See* § 494.-480.4, RSMo Supp.1993.

*VENIREPERSON KINSEY:* They grew up across the street from my husband and—

*THE COURT:* Let me ask this, ma'am: would your knowledge of that person affect your ability to give both the State and the defendant a fair hearing in this case? Nobody asked you those questions on voir dire. The question is if you think that person, would that prevent you from giving both the State and the defendant a fair hearing in this case.

*VENIREPERSON KINSEY:* No. I think I could give a fair hearing. I didn't know the victim. I just know her daughter.

*THE COURT:* Well, the issue is whether or not that will prevent you from being fair and impartial in this particular case.

*VENIREPERSON KINSEY:* I don't know.

*MR. ROSS:* Could I ask you, you indicated that you think that a relative of yours may have grown up?

*VENIREPERSON KINSEY:* Well, I more know her husband. My husband and her husband were friends and they grew up across the street and the fact—in fact, she lived right across the street also in the same subdivision. I'm not really good friends with them or anything. It's just I was more friends with the husband growing up.

*MR. ROSS:* Her husband?

*VENIREPERSON KINSEY:* Uh-huh.

*MR. ROSS:* Have you seen her or her husband?

*VENIREPERSON KINSEY:* Not for four years probably.

*MR. ROSS:* So you have not seen them for four years?

*VENIREPERSON KINSEY:* No.

*MR. ROSS:* Have you talked to either of them about this case?

*VENIREPERSON KINSEY:* No. In fact, I really didn't even realize until you started saying the names, her name, being killed.

*MR. ROSS:* Do you have any plans to see them in the future?

*VENIREPERSON KINSEY:* No.

*MR. ROSS:* Since you haven't seen her or her husband in the four years and having not talked to them about the case and having no plans to see them in the future, do you think that you can put aside the fact that your husband was friends with her husband and base your judgment in this case solely upon the evidence as you hear it in the courtroom?

*VENIREPERSON KINSEY:* I think so.

*MR. ROSS:* And do you feel that you can still be a fair and impartial juror in the case?

*VENIREPERSON KINSEY:* I think so. I just wanted you to be aware.

The court denied appellant's motion to replace juror Kinsey with an alternate juror. Prior to making his guilt phase closing argument six days later, the prosecutor stated that although he felt that there was no legal basis requiring replacement of juror Kinsey, he was willing to have her replaced with an alternate juror. Appellant stated that he had no objection to her remaining on the jury and the court allowed her to remain. In his post-trial motion and on appeal, appellant argues that the court abused its discretion in not granting his motion to replace juror Kinsey. Although the state is arguably correct in its assertion that appellant waived any claim in connection with juror Kinsey, this Court elects to address the claim.

█ Association with a victim's family does not automatically bar someone from serving as a juror in a criminal trial. *State v. Walton,* 796 S.W.2d 374 (Mo. banc 1990). In *Walton,* a family's house had been robbed. One of the venirepersons stated that the victim's son had worked for her husband about five years prior and that she had talked to the family about the facts of the case. Because the venireperson was able to state that the relationship would not influence her, this Court held that the trial court did not abuse its discretion in not striking the juror. *Id.* at 377–79.

█ Here, juror Kinsey did not know the victim. She stated that she knew the victim's daughter and that the victim's daughter's husband had grown up with her husband. Kinsey stated that she had not been

in contact with the victims's daughter in four years, had no plans to contact her in the future, and was unaware of the crime until that moment. She stated that the relationship would not influence or prejudice her.[10] The trial court did not abuse its discretion overruling the motion to replace juror Kinsey.

■ Appellant next asserts that the trial court erred in overruling his motion to reopen voir dire prior to the penalty phase. Appellant claims that because he did not question the venire about whether it would be able to consider mitigating evidence and fully consider his character in spite of his prior first degree murder conviction, the jury could have included individuals whose ability to serve was substantially impaired.[11]

■ Appellant's allegation is without merit. Appellant personally conducted voir dire. He inquired whether evidence of prior convictions would prejudice the venirepersons' deliberation on guilt. He did not inquire into the effect of a prior first degree murder conviction on the venirepersons' ability to deliberate fairly at the sentencing phase. Appellant had the opportunity to voir dire the venire on the issue. As a consequence of appellant's trial strategy to testify in the narrative at the guilt phase and to disclose his conviction, he would have suffered no disadvantage by asking the questions prior to the guilt phase. He is held to the same rules of procedure as attorneys and is entitled to no special procedural indulgence. *State v. Barton,* 593 S.W.2d 262, 264 n. 2 (Mo.App.1980) (quoting *Faretta v. California,* 422 U.S. 806, 834–35 n. 46, 95 S.Ct. 2525, 2540–41 n. 46, 45 L.Ed.2d 562 (1975)).

The court did not err in overruling appellant's motion to reopen voir dire.

■ Finally, appellant asserts that the trial court erred in not empaneling a separate jury for the penalty phase. This Court has repeatedly held that Missouri's statutory scheme, which provides for a single jury to determine guilt and punishment in a capital murder trial, does not violate any constitutional protections. *State v. Kilgore,* 771 S.W.2d 57 (Mo. banc), *cert. denied,* 493 U.S. 874, 110 S.Ct. 211, 107 L.Ed.2d 164 (1989); *State v. O'Neal,* 718 S.W.2d 498, 502 (Mo. banc 1986), *cert. denied,* 480 U.S. 926, 107 S.Ct. 1388, 94 L.Ed.2d 702 (1987); *State v. Roberts,* 709 S.W.2d 857, 868 (Mo. banc), *cert. denied,* 479 U.S. 946, 107 S.Ct. 427, 93 L.Ed.2d 378 (1986). The trial court did not err in refusing to empanel a separate penalty phase jury.

### ISSUES REGARDING COUNSEL

■ Appellant envisions the right as an indigent criminal defendant to have appointed counsel actively defend him at trial while appellant retains the right to step in and take over or supplement appointed counsel's defense. He asserts that the court erred in forcing him to elect between defending by appointed counsel or pro se. Since the Sixth Amendment of the United States Constitution does not grant indigent criminal defendants the right to act as co-counsel with appointed counsel, *McKaskle v. Wiggins,* 465 U.S. 168, 184, 104 S.Ct. 944, 954, 79 L.Ed.2d 122 (1984), appellant bases his constitutional claim to hybrid representation on Article I, § 18(a) of the Missouri Constitution which guarantees that an "accused shall have the right to appear and defend, in person and by

---

10. Appellant asserts that juror Kinsey was never able to unequivocally state that she could be impartial. The record shows, however, that when the prosecutor asked if she could base her judgment solely upon the evidence as heard in the courtroom the juror responded, "I think so." When asked if she could be fair and impartial, she again stated, "I think so." The response "I think so" is not equivocal in the context of voir dire questioning; it is common vernacular to express a positive response. *Cf. State v. Mercer,* 618 S.W.2d 1, 7 (Mo. banc), *cert. denied,* 454 U.S. 933, 102 S.Ct. 432, 70 L.Ed.2d 240 (1981) (holding that the phrase "I don't think so," is not

equivocal because "it is common vernacular to express a negative").

11. Appellant also contends that reopening voir dire was critical to allow him to examine juror Kinsey regarding whether her connection to Mrs. McDonald's daughter would impact her ability to consider a punishment other than death. The court afforded appellant the opportunity to voir dire juror Kinsey after she interrupted the trial to declare her connection to the victim's daughter. He had the opportunity to fully explore any concerns regarding her penalty phase qualifications at that time.

counsel." He argues that the Missouri Constitution is not coextensive with the Sixth Amendment; rather, it was intended to secure the concurrent rights of self-representation *and* representation by counsel.

Appellant's contention ignores Missouri courts' construction of the language of Article I, § 18(a), which confers discretion upon the trial court to permit joint representation, but does not grant a constitutional right to joint representation. *State v. Turner,* 623 S.W.2d 4, 12 (Mo. banc 1981), *cert. denied,* 456 U.S. 931, 102 S.Ct. 1982, 72 L.Ed.2d 448 (1982); *State v. Velanti,* 331 S.W.2d 542, 546 (Mo. banc 1960); *State v. Burgin,* 539 S.W.2d 652, 653–54 (Mo.App.1976).

Alternatively, appellant argues that the court abused its discretion in not allowing joint representation. The record does not support appellant's contention.

■ Appellant next asserts that the court erred in allowing Mr. Braun to act as standby counsel during pretrial hearings because of a conflict of interest. Appellant also asserts that the motion court clearly erred in overruling his *Rule 29.15* motion alleging the conflict of interest.

Appellant's assertions are incorrect. On April 5, 1990, Mr. Braun informed the court that he was running for St. Charles Prosecuting Attorney in the November election, and stated that appellant could request another attorney from the public defender's office. Appellant informed the court that he wanted to reserve his decision on Braun's replacement until after pretrial matters were resolved. After further discussion, the court found that no conflict of interest existed and allowed Braun to serve as one of appellant's two standby counselors. The court allowed Braun to withdraw from standby representation on September 13, 1990, almost two months prior to the election and three months prior to trial.

■ To establish a Sixth Amendment violation, appellant must show that Braun had an actual conflict of interest that adversely affected his performance. *Cuyler v. Sullivan,* 446 U.S. 335, 348, 100 S.Ct. 1708, 1718, 64 L.Ed.2d 333 (1980). A conflict of interest exists where a criminal defendant's attorney also acts as an assistant attorney general without his client's knowledge and assent. *State v. Crockett,* 419 S.W.2d 22, 28–30 (Mo.1967). A conflict does not exist where a defendant's attorney terminated his employment with a prosecutor's office three years before the defendant pled guilty. *Davis v. State,* 763 S.W.2d 345, 347–48 (Mo. App.1988). Here, Braun had no current or past affiliation with the prosecutor's office. Braun was only a candidate, and the election was two months distant when he withdrew from the case. He owed the prosecutor's office no commitment or loyalty while acting as appellant's standby attorney. No actual conflict of interest existed. Furthermore, Braun was one of two standby counselors. The other standby attorney knew of Braun's candidacy and was in a position to ensure appellant's interests were protected. *See Commonwealth v. Wakeley,* 433 Pa. 159, 249 A.2d 303, 304 (1969). Finally, appellant was offered the opportunity to request Braun's replacement after being informed of Braun's candidacy, but decided to withhold action. The court did not err.

### ISSUES REGARDING PROSECUTOR'S CLOSING ARGUMENT

■ Appellant asserts that the court erred in overruling his objection to the prosecutor's victim impact argument during the penalty phase. Appellant asserts that Article I, § 21 of the Missouri Constitution creates a per se prohibition against victim impact argument. Appellant also asserts that the prosecutor's victim impact argument violated his rights to due process and to be free from cruel and unusual punishment.

■ The federal constitution does not impose a per se bar against victim impact evidence or argument. *Payne v. Tennessee,* 501 U.S. 808, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991) (overruling *Booth v. Maryland,* 482 U.S. 496, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987), and *South Carolina v. Gathers,* 490 U.S. 805, 109 S.Ct. 2207, 104 L.Ed.2d 876 (1989)). The Missouri Constitution's limitation on victim impact evidence and argument is coextensive with the federal constitution. Under both, victim impact evidence and arguments may be relevant and admissible at

the penalty phase. *Payne*, 501 U.S. at 827, 111 S.Ct. at 2609 ("A State may legitimately conclude that evidence about the victim and about the impact of the murder on the victim's family is relevant to the jury's decision as to whether or not the death penalty should be imposed."); *State v. Whitfield*, 837 S.W.2d 503, 511 (Mo. banc 1992). Victim impact evidence and argument violates the constitution if it is "so unduly prejudicial that it renders the trial fundamentally unfair." *Payne*, 501 U.S. at 825, 111 S.Ct. at 2608.

The prosecutor's references to victim impact here were brief, light, and general. The prosecutor did not delve into the victim's personal characteristics or relative worth. No family members testified as to their loss or emotional distress. The statements did not remove reason from the sentencing process, nor did they inject caprice and emotion. The trial court did not abuse its discretion in overruling appellant's objection.

■ Appellant asserts that the trial court plainly erred in allowing the prosecutor to make various improper arguments during closing. Appellate review of assertions of plain error in a prosecution's closing argument pressures trial courts into the situation of "uninvited interference with summation and a corresponding increase in the risk of error by such intervention." *State v. Clemmons*, 753 S.W.2d 901, 907–08 (Mo. banc), *cert. denied*, 488 U.S. 948, 109 S.Ct. 380, 102 L.Ed.2d 369 (1988); *see also State v. Kempker*, 824 S.W.2d 909, 911 (Mo. banc 1992) ("A holding that would require the judge to interrupt counsel presents myriad problems."). Because appellant did not object, any errors are deemed waived. *State v. McMillin*, 783 S.W.2d 82, 98 (Mo. banc), *cert. denied*, 498 U.S. 881, 111 S.Ct. 225, 112 L.Ed.2d 179 (1990). Gratuitous review reveals no plain error.

### RIGHT OF ALLOCUTION

Appellant argues that the trial court erred in refusing to allow him to speak to the jury, without being subject to cross-examination, prior to the jury's deliberation at the penalty phase.

■ Appellant misconceives "allocution." *Rule 29.07(b)(1)*, entitled "Allocution and Imposition of Sentence," states "[w]hen the defendant appears for judgment and sentence, he must be informed by the court of the verdict or finding and asked whether he has any legal cause to show why judgment and sentence should not be pronounced against him." The language of the rule makes clear that a defendant's right of allocution under the rules arises at imposition of sentence, after the jury has reached a verdict. The rule does not grant criminal defendants the right to address the jury. *State v. Whitfield*, 837 S.W.2d 503, 514 (Mo. banc 1992).

■ Appellant asserts that the federal constitution grants him the right to address the jury without being subject to cross-examination. Appellant is mistaken, however, on the scope of any constitutional right of allocution. In *Hill v. United States*, 368 U.S. 424, 82 S.Ct. 468, 7 L.Ed.2d 417 (1962), the United ed States Supreme Court held that the constitution does not impose an obligation on courts to *offer* criminal defendants the opportunity to address the court prior to imposition of sentence. The Court did not address whether a constitutional right to allocution exists where a defendant affirmatively requests the opportunity to speak. Several federal circuit courts have held that the right of allocution is constitutionally protected where a criminal defendant affirmatively requests the right to speak. *United States v. Moree*, 928 F.2d 654, 656 (5th Cir.1991); *United States v. Jackson*, 923 F.2d 1494, 1496 (11th Cir.1991); *Ashe v. North Carolina*, 586 F.2d 334 (4th Cir.1978), *cert. denied*, 441 U.S. 966, 99 S.Ct. 2416, 60 L.Ed.2d 1072 (1979). The circuits hold, however, that the constitution grants such defendants the right to address the court at imposition of sentence, not the right to address the jury. Appellant addressed the trial court prior to the imposition of sentence in accordance with *Rule 29.07(b)(1)* and any constitutional guarantees. His claim of trial court error is without merit.

### ISSUES CONCERNING INSTRUCTIONAL ERROR

Appellant raises several points on appeal challenging the jury instructions at the guilt

and penalty phases. Appellant first asserts that the trial court erred in submitting MAI–CR3d 302.04. The instruction states:

> A reasonable doubt is a doubt based upon reason and common sense after careful and impartial consideration of all the evidence in the case.
>
> Proof beyond a reasonable doubt is proof that leaves you firmly convinced of the defendant's guilt. The law does not require proof that overcomes every possible doubt. If, after your consideration of all the evidence, you are firmly convinced that the defendant is guilty of the crime charged, you will find him guilty. If you are not so convinced, you must give him the benefit of the doubt and find him not guilty.

MAI–CR3d 302.04. Relying on *Cage v. Louisiana*, 498 U.S. 39, 111 S.Ct. 328, 112 L.Ed.2d 339 (1990), appellant argues that the explanation of reasonable doubt contained in MAI–CR3d 302.04 sets the reasonable doubt standard higher than constitutionally permitted. This Court has previously examined MAI–CR3d 302.04 in light of *Cage* and found that the instruction properly explains the reasonable doubt standard. *State v. Griffin*, 848 S.W.2d 464, 469 (Mo. banc 1993).

■ Appellant next asserts that the trial court plainly erred in submitting MAI–CR3d 313.04 because the instruction creates a risk of coerced decisions resulting in convictions for first degree murder. MAI–CR3d 313.04 states: "If you do not find the defendant guilty of murder in the first degree, you must consider whether he is guilty of murder in the second degree."

Appellant relies on an Oregon Supreme Court decision, *State v. Allen*, 301 Or. 35, 717 P.2d 1178 (1986). In *Allen*, the court struck down a transitional instruction that allowed the jury to consider a lesser included offense only "if the jury found the defendant *not guilty*" of the greater offense. *Id.* at 1179 (emphasis added). The court reasoned that the "acquittal first" instruction exacerbated the risk that those voting in the jury's minority would be coerced to vote with the majority. The *Allen* court approved an instruction that told the jury "you should first consider the charged offense and, *if you cannot agree*

on a verdict on the charged offense, you should then consider the lesser included offense." *Id.* at 1179, 1181 (emphasis added).

Contrary to appellant's assertion, MAI–CR3d 313.04 is not an "acquittal first" instruction. Unlike the instruction struck down by the Oregon Supreme Court, Missouri juries do not have to find a defendant "not guilty" of the greater offense, first degree murder, before considering the lesser included offense, second degree murder. Instead, pursuant to MAI–CR3d 313.04, Missouri juries are allowed to consider the lesser included offense if they "do not find the defendant guilty" of the greater offense. The difference in terminology carries meaning. Under Oregon's "acquit first" instruction, a jury deadlocked on the greater charge could not consider the lesser included charge because, being deadlocked, they have not found the defendant "not guilty" of the greater offense. Under MAI–CR3d 313.04, however, a jury deadlocked on the greater offense has not found the defendant guilty on the greater charge, thus can consider the lesser included offense. Therefore, any coercive effect of an "acquittal first" instruction does not exist in MAI–CR3d 313.04. MAI–CR3d 313.04 properly instructs the jury on Missouri law. *See* §§ 565.025, 556.046. The trial court did not err in submitting MAI–CR3d 313.04; the instruction provides the proper transitional instruction to the lesser included offense of second degree murder.

■ Appellant also asserts that the court erred in refusing to instruct the jury on felony murder. The second degree conventional murder instruction sufficiently tested the jury's belief of the elements of first degree murder; therefore, no prejudice exists. *State v. Six*, 805 S.W.2d 159, 164 (Mo. banc), *cert. denied*, —— U.S. ——, 112 S.Ct. 206, 116 L.Ed.2d 165 (1991); *State v. Petary*, 781 S.W.2d 534, 544 (Mo. banc 1989), *vacated and remanded*, 494 U.S. 1075, 110 S.Ct. 1800, 108 L.Ed.2d 931 (1990), *reaffirmed*, 790 S.W.2d 243 (Mo. banc 1990), *cert. denied*, 498 U.S. 973, 111 S.Ct. 443, 112 L.Ed.2d 426 (1990); *State v. Griffin*, 756 S.W.2d 475, 485 (Mo. banc 1988), *cert. denied*, 490 U.S. 1113, 109 S.Ct. 3175, 104 L.Ed.2d 1036 (1989).

Appellant makes a bare assertion, unsupported by argument, that the trial court erred in overruling his motion challenging the constitutionality of § 565.030 and what appellant refers to as the "applicable MAI instructions," MAI–CR3d 313.40, 313.41, 313.42, 313.44, 313.46, and 313.48. In connection with this claim, appellant complains of the trial court's rejecting his proposed non-MAI instructions. Because of appellant's failure to develop his claims, and because the instructions submitted by the court were properly submitted, this Court declines to address appellant's assertion.

■■■ Appellant next contends that the trial court erred in refusing to submit six proposed mitigating circumstances instructions. He claims that the instructions correct constitutional deficiencies in the MAI instructions in that the proposed instructions seek to ensure that jury would consider all mitigating circumstances so that the jury could make a reliable sentencing determination. Because MAI–CR3d 313.44 adequately covers the jury's consideration of mitigating circumstances, the trial court properly submitted that instruction to the exclusion of appellant's non-MAI instructions. *State v. Ervin,* 835 S.W.2d 905, 922–23 (Mo. banc 1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1368, 122 L.Ed.2d 746 (1993); *Rule 28.02(c).*

■■■ Appellant makes three specific arguments regarding his proposed mitigating circumstances instructions. First, appellant asserts that the court erred in refusing to submit an instruction listing nonstatutory mitigating circumstances. The trial court properly ruled. *State v. Mease,* 842 S.W.2d 98 (Mo. banc 1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 2363, 124 L.Ed.2d 269 (1993); *State v. Wacaser,* 794 S.W.2d 190 (Mo. banc 1990); *MAI–CR3d 313.44, Note on Use 6.* Second, appellant asserts that the court erred in failing to submit his proposed instruction defining the term mitigation. Appellant is again incorrect. MAI instructions do not define mitigation; therefore, the court properly refused the proposed definition. *State v. Feltrop,* 803 S.W.2d 1, 14 (Mo. banc), *cert. denied,* —— U.S. ——, 111 S.Ct. 2918, 115 L.Ed.2d 1081 (1991). Finally, appellant asserts that the court erred in not submitting the statutory mitigating circumstance that he was under the influence of extreme mental or emotional disturbance. § 565.032.3(2), RSMo Supp.1993. The court properly refused the instruction because the evidence did not support its submission. *State v. Parkus,* 753 S.W.2d 881, 889 (Mo. banc), *cert. denied,* 488 U.S. 900, 109 S.Ct. 248, 102 L.Ed.2d 237 (1988). Although there was testimony that appellant had been using cocaine, cocaine use is not evidence of an extreme mental or emotional disturbance. Appellant argues that he was desperate for money to buy drugs, but desperation is not evidence of an extreme mental or emotional disturbance. Moreover, the court did submit a mitigating instruction on whether appellant's capacity "to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was substantially impaired." § 565.032.3(6), RSMo Supp.1993. The submitted instruction properly instructed the jury and allowed the jury to decide any mitigating effect of appellant's alleged cocaine use.

■■■ Appellant next asserts that the trial court erred in refusing to submit proposed instruction M which states: "You may impose a life sentence for any reason or without having a reason." Appellant's assertion is meritless. The court submitted MAI–CR3d 313.46:

> You are not compelled to fix death as the punishment even if you do not find the existence of one or more mitigating circumstances sufficient to outweigh the aggravating circumstance or circumstances which you find to exist. You must consider all the circumstances in deciding whether to assess and declare the punishment at death. Whether that is to be your final decision rests with you.

MAI–CR3d 313.46. The submitted MAI instruction tells the jury "in unmistakable terms that it is never obliged to return a death sentence.... [and that] a juror may vote against a death sentence without having a reason." *State v. Petary,* 790 S.W.2d 243, 246 (Mo. banc), *cert. denied,* 498 U.S. 973, 111 S.Ct. 443, 112 L.Ed.2d 426 (1990). The court, therefore, correctly refused to submit

appellant's proposed instruction. *Rule 28.-02(c).*

■ Appellant next asserts that the trial court erred in refusing to submit proposed penalty phase instructions that would have informed the jury that victim impact is an improper consideration in the sentencing decision. The trial court did not err in refusing to submit the non-MAI instruction. A jury may consider victim impact in making the sentencing decision so long as the victim impact evidence and argument is not unduly prejudicial. *Payne v. Tennessee,* 501 U.S. 808, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991); *State v. Whitfield,* 837 S.W.2d 503, 511 (Mo. banc 1992). The prosecutor's victim impact argument was not unduly prejudicial and the jury was entitled to consider it in making their sentencing decision.

■ Appellant next asserts that it was plain error for the court to submit Instruction 10. The instruction stated:

In determining the defendant's guilt or innocence, you are instructed that an intoxicated or a drugged condition whether from alcohol or drugs will not relieve a person of responsibility for his conduct.

Appellant asserts that the instruction relieved the state of establishing the required mental state of deliberation beyond a reasonable doubt. In *State v. Erwin,* 848 S.W.2d 476 (Mo. banc), *cert. denied,* — U.S. —, 114 S.Ct. 88, 126 L.Ed.2d 56 (1993), this Court held that the following instruction violated due process because it excused the state from proving the defendant's mental state beyond a reasonable doubt:

You are instructed that an intoxicated condition from alcohol will not relieve a person of responsibility for his conduct.

The instruction here is similar to the one struck down in *Erwin;* however, the *Erwin* holding was limited to cases tried in the future and cases subject to direct appeal where the issue had been preserved. *Id.* at 484. Appellant failed to preserve the issue. Gratuitous review reveals that error, if any, was harmless.

## PENALTY PHASE CONTINUANCE

■ Appellant asserts that the trial court erred in not granting a continuance to prepare for the penalty phase. At noon on December 10, 1990, the jury retired to deliberate on the guilt phase. The court took a ten minute recess after which appellant notified the court that, if convicted, he wanted standby counsel to represent him at the penalty phase. Counselor McClain orally requested a continuance of the penalty phase until 1:00 p.m. the following day. The court denied the request, but stated that it would continue the penalty phase until 9:00 a.m. the next morning. The jury returned a guilty verdict at 2:15 p.m. that afternoon and the penalty phase commenced at 10:30 a.m. the following morning.

■ The decision to grant or deny a continuance is committed to a trial court's sound discretion. *State v. Schaal,* 806 S.W.2d 659, 666 (Mo. banc 1991), *cert. denied,* — U.S. —, 112 S.Ct. 976, 117 L.Ed.2d 140 (1992). Lack of preparation does not constitute grounds for granting a continuance where a party had adequate opportunity to prepare. *Id.* Appellant's argument that standby counsel had less than one day to prepare for the penalty phase mistakenly assumes that penalty phase preparation cannot begin until the guilt phase is concluded. Furthermore, a pro se defendant cannot generate cause for granting a continuance by shifting responsibility to standby counsel at the last minute. *See State v. Barton,* 593 S.W.2d 262, 264 n. 2 (Mo.App.1980) (holding that pro se defendants are bound by the same rules of procedure as those admitted to practice law and entitled to no indulgence they would not have received if they were represented by counsel); *Richardson v. State,* 773 S.W.2d 858, 859 (Mo.App.1989) (stating that "it is axiomatic that a defendant may not take advantage of self-invited error or error of his own making"). The court did not abuse its discretion in refusing to grant a continuance.

## ISSUES REGARDING AGGRAVATING AND MITIGATING CIRCUMSTANCES

The state presented three statutory aggravating circumstances at the penalty phase:

(1) appellant had "a prior record of conviction for murder in the first degree," § 565.032.-2(1), RSMo Supp.1993; (2) appellant murdered Mrs. McDonald "for the purpose of receiving money or any other thing of monetary value from the victim of the murder," § 565.032.2(4), RSMo Supp.1993; and (3) appellant murdered Mrs. McDonald "while ... engaged in the perpetration ... of ... robbery," § 565.032.2(11), RSMo Supp.1993. In mitigation, appellant presented eight witnesses who testified regarding his background and character. The jury found that all three aggravating circumstances existed and recommended the death sentence. Appellant raises several points on appeal regarding aggravating and mitigating circumstances.

▇▇▇▇ Appellant first asserts that the trial court erred in allowing the state to submit his prior first degree murder conviction as an aggravating circumstance. He contends that the guilty plea and conviction resulted from an unconstitutional confession; therefore, the prior murder conviction cannot support an aggravating circumstance. Appellant relies on *Johnson v. Mississippi,* 486 U.S. 578, 108 S.Ct. 1981, 100 L.Ed.2d 575 (1988), in which the United States Supreme Court reversed a death sentence where the sole aggravating circumstance was a felony conviction that had subsequently been reversed. The present case is clearly distinguishable. In *Johnson,* Mississippi improperly relied on a reversed conviction as an aggravating circumstance. *Id.* Here, appellant's prior conviction has not been reversed. Thus, the trial court properly allowed the conviction to support an aggravating circumstance. Furthermore, appellant's attempt to raise a constitutional challenge to a prior murder conviction at the penalty phase was improper. *State v. Ervin,* 835 S.W.2d 905, 925 (Mo. banc 1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1368, 122 L.Ed.2d 746 (1993).

▇▇▇ Appellant also argues that the court plainly erred in allowing the state to read the guilty plea transcript from appellant's prior murder conviction into the record, thereby removing reason from the jury's sentencing decision. The jury was informed that appellant was eighteen years old when he deliber-

ately, with premeditation, shot and killed Mr. Gianino. The transcript of the guilty plea revealed that appellant was a passenger in Mr. Gianino's car; that police saw appellant wipe his fingerprints off the car and run into a house; that appellant was found lying in bed fully clothed with a sheet over his head; that police recovered from appellant four bullets, a .38 revolver, Mr. Gianino's watch and keys, and sixty-two cents; that Mr. Gianino's body was found in an alley and he died instantly from a gunshot that lacerated the spinal cord; that appellant confessed to shooting Mr. Gianino; that appellant's fingerprints were found inside the car; that overalls worn by appellant contained blood that matched Mr. Gianino's blood type; and that the shooting was without provocation. The guilty plea transcript also revealed that appellant would have presented evidence in mitigation that he was attempting to resist a persistent homosexual advance when he shot Mr. Gianino during a scuffle. The transcript presented the prosecutor's statement that there was no physical evidence of a struggle and that the claim of a scuffle was first being heard at the guilty plea and was not included in appellant's videotaped confession. The transcript also noted that Mr. Gianino was a family man with six children; that appellant had three or four felonies as a juvenile; and that the court had told appellant that he had done a very, very mean thing taking the life of another human being and that but for appellant's youth, and lack of sufficient facts, the court would seriously and willingly sentence him to death.

▇▇▇ To be entitled to plain error relief, "appellant bears the burden of demonstrating that the action of the trial court was not only erroneous, but that the error so substantially impacted upon his rights that manifest injustice or a miscarriage of justice will result if the error is left uncorrected." *State v. Hornbuckle,* 769 S.W.2d 89, 92–93 (Mo. banc), *cert. denied,* 493 U.S. 860, 110 S.Ct. 171, 107 L.Ed.2d 128 (1989). During the penalty phase of a bifurcated trial, "it [is] desirable for the jury to have as much information before it as possible when it makes the sentencing decision." *Gregg v. Georgia,* 428 U.S. 153, 203–04, 96 S.Ct. 2909, 2939, 49

L.Ed.2d 859 (1976). This Court has, accordingly, declined to impose strict evidentiary limits during the penalty phase. *See State v. Smith*, 781 S.W.2d 761 (Mo. banc 1989) (upholding the introduction of the details of a prior conviction); *State v. Petary*, 781 S.W.2d 534, 539 (Mo. banc 1989) (upholding the introduction of evidence of prior unadjudicated criminal conduct during the punishment phase, stating that "[t]he jury at the punishment phase is entitled to full information about the defendant and his previous conduct." Under the statute, unadjudicated evidence of Petary's sexual abuse of his children was relevant to show his character where the jury was aware that the crimes were unadjudicated). In a similar situation, the United States Supreme Court found no constitutional violation where the State of Oklahoma introduced the following at the penalty phase of a capital murder trial: (1) a copy of a defendant's prior judgment and death sentence; (2) testimony of the prior victims's neighbor concerning her observations the day of the murder; (3) the prior victim's autopsy report; and (4) photographs and fingerprints that showed that the defendant in the prior case was the defendant in the present case. *Romano v. Oklahoma*, —— U.S. ——, 114 S.Ct. 2004, 129 L.Ed.2d 1 (1994).

Here the guilty plea transcript, judgment, and sentence from appellant's prior first degree murder conviction constituted evidence supporting the statutory aggravating circumstance of a prior first degree murder conviction. § 565.032.2(1), RSMo Supp.1993. The details surrounding appellant's prior murder gave the jury relevant information regarding the appellant and his character. The trial court did not plainly err in allowing the state to read the details surrounding appellant's prior murder into the record.

Appellant next asserts that the court erred in allowing the state to submit both the statutory aggravating circumstance of murder for the purpose of pecuniary gain, § 565.-032.2(4), RSMo Supp.1993, and the statutory aggravating circumstance of murder during the perpetration of a robbery, § 565.032.-2(11), RSMo Supp.1993. The Court rejected the same argument in *State v. Griffin*, 756

S.W.2d 475, 489 (Mo. banc 1988), *cert. denied*, 490 U.S. 1113, 109 S.Ct. 3175, 104 L.Ed.2d 1036 (1989). *See also State v. Walls*, 744 S.W.2d 791, 798–99 (Mo. banc), *cert. denied*, 488 U.S. 871, 109 S.Ct. 181, 102 L.Ed.2d 150 (1988); *State v. Jones*, 749 S.W.2d 356, 365 (Mo. banc), *cert. denied*, 488 U.S. 871, 109 S.Ct. 186, 102 L.Ed.2d 155 (1988).

Appellant attempted to introduce as mitigating evidence a copy of a letter written by his department of corrections supervisor during appellant's prior incarceration. Appellant asserts that the letter contained evidence of his talent in music, poetry, and writing, and that these aspects of his character warranted a sentence less than death. The state objected to introduction of the copy on foundation grounds, Business Records Act, § 490.660 to 490.690, RSMo 1986; § 490.692, RSMo Supp.1993., and argued that such evidence was cumulative of evidence already presented.

Appellant asserts that the letter should have been admitted despite the lack of foundation. Appellant analogizes to *Green v. Georgia*, 442 U.S. 95, 99 S.Ct. 2150, 60 L.Ed.2d 738 (1979) (per curiam), which held that mitigating evidence that violates hearsay rules is nonetheless admissible. In *Green*, the Court held that under the unique facts presented, exclusion of hearsay evidence was unconstitutional. *Green* is clearly distinguishable. The evidence excluded in *Green* was highly relevant to a critical issue. *Id.* at 96, 99 S.Ct. at 2151. The defendant proffered testimony of a state's witness concerning a codefendant's admission that he, rather than defendant, actually killed the victim. In the present case, the mitigating evidence that appellant seeks to have admitted was cumulative of other witness testimony. Appellant admits this but argues that because the statement comes from a department of corrections supervisor, it carries more credibility. *Skipper v. South Carolina*, 476 U.S. 1, 8, 106 S.Ct. 1669, 1672, 90 L.Ed.2d 1 (1986). Credibility differentials may serve as the basis for admitting cumulative evidence in some cases, but, here, credibility is, at most, a slight consideration because of the noncontested evidence adduced by other witnesses. The court correctly excluded the cumulative

evidence of appellant's talent in music, poetry, and writing contained in the letter.

■ Finally, appellant claims the trial court erred in sustaining the state's objection to appellant's attempt to introduce proportionality evidence during the penalty stage. The trial court did not err. Missouri juries do not conduct proportionality analysis. *State v. Schneider,* 736 S.W.2d 392 (Mo. banc 1987), *cert. denied,* 484 U.S. 1047, 108 S.Ct. 786, 98 L.Ed.2d 871 (1988). Responsibility to conduct proportionality analysis of death sentences is vested within this Court. § 565.-035.3(3).

## POSTCONVICTION RELIEF ISSUES

Appellant raises claims relative to postconviction relief in addition to those raised in connection with points in the direct appeal. Appellant first asserts that the motion court erred in not granting a continuance for the *Rule 29.15* hearing. The court stated that circumstances did not merit a continuance, and, even if a continuance were warranted, it was powerless to grant a continuance beyond sixty days after granting the hearing.

*Rule 29.15(g)* states that "[i]f a hearing is ordered, it shall be held within sixty days of the date of the order granting a hearing." *Rule 29.15(h)* states that a "court may continue the hearing upon a showing of good cause." *Rule 29.15(h)* can be read either as authorizing a court to grant a continuance subject to *Rule 29.15(g)'s* requirement that the hearing be held within sixty days, or as authorizing a court to grant a continuance beyond the sixty day period. Resolution turns on whether *Rule 29.15(h)* is subject to or supplements *Rule 29.15(g).* In practice at least some courts have granted continuances beyond sixty days after the date of the order granting a hearing. *See e.g., State v. Ervin,* 835 S.W.2d 905, 929 (Mo. banc 1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1368, 122 L.Ed.2d 746 (1993); *State v. Six,* 805 S.W.2d 159, 172 (Mo. banc), *cert. denied,* —— U.S. ——, 112 S.Ct. 206, 116 L.Ed.2d 165 (1991). Courts have not, however, directly ruled on the issue.

■ While quick resolution of postconviction claims is a meritorious policy objective, circumstances may arise where justice requires a court to grant parties a continuance beyond the sixty day period. The policy objective of quick resolution of postconviction claims will not be seriously impaired by granting a continuance beyond sixty days to defendants who are able to show good cause. *Rule 29.15(h),* therefore, should be read to supplement *Rule 29.15(g),* allowing courts to grant continuances beyond sixty days after the granting of a hearing.

■ The trial court did not abuse its discretion in holding that circumstances did not justify granting a continuance. Appellant based his continuance motion on a general assertion of inadequate time to investigate and prepare witnesses and a specific claim of an inability to have two crucial witnesses, Mr. McClain and Dr. Parwatikar, testify. McClain was one of two standby counselors at the guilt phase and one of two counselors at the penalty phase. McClain had relocated out of state and did not testify at the hearing due to a scheduling conflict. Dr. Parwatikar had originally opined at the pretrial hearings that appellant was competent, but he reversed his opinion after the trial. He was unable to testify at the postconviction hearing due to illness.

■ Claims of insufficient time to prepare for a postconviction hearing do not constitute good cause to grant a continuance where movant has been given adequate time to prepare. *See e.g., State v. Ervin,* 835 S.W.2d 905, 929 (Mo. banc 1992) (court did not abuse its discretion in overruling continuance motion where public defender's office had been appointed for over seven months and second appointed counsel had more than a month to prepare for the hearing), *cert. denied,* —— U.S. ——, 113 S.Ct. 1368, 122 L.Ed.2d 746 (1993); *State v. Six,* 805 S.W.2d 159, 172 (Mo. banc) (court did not abuse its discretion in overruling continuance motion where counsel had represented the defendant for over eight months and second appointed counsel entered an appearance six months before the hearing), *cert. denied,* —— U.S. ——, 112 S.Ct. 206, 116 L.Ed.2d 165 (1991); *see also Conway v. State,* 780 S.W.2d 102 (Mo.App.1989) (movant must demonstrate due diligence where *Rule 29.15* continuance

motions are based upon the absence of witnesses or lack of evidence). Here, postconviction counsel was appointed six months prior to the hearing. The hearing date was set almost two months in advance. Appellant had adequate time to prepare for the hearing, and any problems complying with the time constraints imposed by the scheduled hearing were self-inflicted. The record shows that appellant waited over a month after the hearing was scheduled before notifying McClain of the hearing date, giving McClain less than three weeks notice. After the court ruled that it would not grant a continuance, appellant had two weeks in which to secure McClain's deposition which could have been read into the record under § 492.400.[12] The court did not abuse its discretion.

Appellant asserts that Dr. Parwatikar's inability to appear because of illness constitutes good cause to grant a continuance. Appellant also asserts that the court erred in failing to reopen the hearings after it received Dr. Parwatikar's revised competency report that opined that appellant had not been mentally competent to waive the right to counsel. Again, the court did not abuse its discretion. The other expert who had found appellant competent did not alter his opinion. More importantly, appellant fully demonstrated his competence. Two judges had extensive opportunities to observe and appraise appellant's competence during the pretrial hearings and while appellant represented himself during the entire guilt phase of trial. The court was also presented with compelling evidence of appellant's competence by way of appellant's numerous pro se filings. The court remarked at the end of the trial that appellant had done an excellent job representing himself. This Court's evaluation of the record in this respect mirrors the trial court's. Any subsequent opinion by Dr. Parwatikar that appellant was incompetent to stand trial is refuted by appellant's demonstrated competence. Point denied.

■■■■ Appellant next asserts that the judge erred in overruling the motion to disqualify him from ruling on the postconviction motion. Appellant asserts in essence that the postconviction judge was biased and prejudiced because he had served as the trial judge and had an interest in upholding trial court actions. Appellant correctly states that due process requires removal of biased and prejudiced arbitrators. Appellant failed, however, to demonstrate bias or prejudice. A judge ruling on postconviction claims is not biased or prejudiced simply because the judge presided over the trial. *See Liteky v. United States,* —— U.S. ——, ——, 114 S.Ct. 1147, 1155, 127 L.Ed.2d 474 (1994); *Thomas v. State,* 808 S.W.2d 364 (Mo. banc 1991); *see also State v. Hunter,* 840 S.W.2d 850, 866 (Mo. banc 1992) ("A disqualifying bias and prejudice is one that has an extrajudicial source and results in an opinion on the merits on some basis other than what the judge learned from his participation in the case."), *cert. denied,* —— U.S. ——, 113 S.Ct. 3047, 125 L.Ed.2d 732 (1993).

■■■■ Appellant also asserts that the judge should have disqualified himself because appellant intended to call the judge as a witness at the hearing for the purpose of showing that appellant's first victim's family members cried during the penalty phase. Appellant also sought the judge's testimony for the purpose of testifying about off-the-record discussions. In *Thomas,* 808 S.W.2d at 367, this Court discussed the benefits of having the judge who presided over a trial rule on postconviction claims. Obviously, all postconviction judges who also presided at the trial stage will have witnessed the trial proceedings. To allow movants as a matter of course to force a trial judge's recusal from postconviction actions simply by endorsing the judge as a witness would frustrate *Thomas'* policy objectives. Appellant failed to assert a compelling reason to call the judge as a witness at the postconviction hearing. Point denied.

■■■■ Appellant next asserts that postconviction counsel's inadequate preparation

---

**12.** The record also reveals that appellant waited over five months after postconviction counsel had been appointed before delivering material for Dr. Parwatikar to use to review his earlier competency opinion, giving Dr. Parwatikar less than two weeks to review the material and reconsider his opinion.

constitutes a form of abandonment.[13] Postconviction counsel did not abandon appellant. Counsel timely filed an amended motion, sought continuances, represented appellant at the postconviction hearing, and sought to reopen the hearing. Counsel's actions preclude a finding of abandonment. *State v. Ervin*, 835 S.W.2d 905, 928 (Mo. banc 1992), *cert. denied*, —— U.S. ——, 113 S.Ct. 1368, 122 L.Ed.2d 746 (1993).

 Appellant's amended *Rule 29.15* motion alleged numerous instances of penalty phase counsel's ineffectiveness. To prove ineffective assistance, appellant must show that counsel's performance did not conform to the degree of skill, care, and diligence of a reasonably competent attorney, and that appellant was thereby prejudiced. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984). The motion court found that penalty phase counsel was not ineffective. Review is limited to determining whether the motion court clearly erred. *Sanders v. State*, 738 S.W.2d 856, 857 (Mo.App.1987); *Rule 29.15(j)*.

Appellant argues that counsel's ineffectiveness should be presumed because the court refused to allow adequate time to prepare for the penalty phase. As previously discussed, appellant and counsel had adequate time to prepare for the penalty phase. The court did not clearly err.

Appellant asserts that counsel was ineffective for failing to elicit all mitigating evidence from appellant's penalty phase witnesses, but fails to detail what mitigating evidence counsel failed to elicit. The court did not clearly err.

 Appellant next asserts that ineffectiveness should be presumed from counsel's short penalty phase closing argument. Without more, this Court will not presume ineffectiveness from the brevity of counsel's closing argument. Trial strategy may favor a concise penalty phase closing argument. The court did not clearly err.

Appellant next asserts that counsel was ineffective for failing to move to reopen the

competency hearings and for failing to call expert witnesses to testify on appellant's mental competence. The court made detailed findings in this area and gave several well-reasoned explanations why counsel was not ineffective for deciding not to call any expert witnesses at the penalty phase. Even if the decision not to call experts and reopen the competency hearing were indicia of ineffectiveness, any error would be harmless. As previously discussed, the court had ample opportunity to view and appraise appellant's competency. Any expert opinion that appellant was incompetent would be refuted by appellant's demonstrated competence. The court did not clearly err.

Finally, appellant argues that counsel was ineffective for failing to object to the introduction of details surrounding appellant's prior first degree murder conviction. As previously discussed, details of the prior murder conviction were admissible. Counsel was not, therefore, ineffective for failing to object. *State v. Ervin*, 835 S.W.2d 905, 932 (Mo. banc 1992), *cert. denied*, —— U.S. ——, 113 S.Ct. 1368, 122 L.Ed.2d 746 (1993).

## CONSTITUTIONALITY OF MISSOURI'S DEATH PENALTY

 Appellant argues that Missouri's death penalty scheme is unconstitutional because this Court fails to provide adequate proportionality review, because prosecutors have discretion in seeking the death penalty, and because Missouri has no valid governmental interest in the death penalty. This Court has consistently rejected these arguments, and being presented with no reason for changing position, does so again. *See State v. Wacaser*, 794 S.W.2d 190, 196 (Mo. banc 1990) (proportionality); *State v. McMillin*, 783 S.W.2d 82, 101–02 (Mo. banc) (prosecutor discretion), *cert. denied*, 498 U.S. 881, 111 S.Ct. 225, 112 L.Ed.2d 179 (1990); *State v. Amrine*, 741 S.W.2d 665, 669 (Mo. banc 1987) (legitimate interest), *cert. denied*, 486 U.S. 1017, 108 S.Ct. 1756, 100 L.Ed.2d 218 (1988).

---

**13.** Alternatively, appellant asserts that postconviction counsel was ineffective. Claims of ineffective assistance of postconviction counsel are not cognizable. *State v. Ervin*, 835 S.W.2d 905, 928 (Mo. banc 1992), *cert. denied*, —— U.S. ——, 113 S.Ct. 1368, 122 L.Ed.2d 746 (1993).

## INDEPENDENT REVIEW
## UNDER § 565.035

Pursuant to § 565.035, this Court must determine: whether the jury imposed the sentence of death "under the influence of passion, prejudice, or any other arbitrary factor;" whether the jury's finding of statutory aggravating circumstances is supported by the evidence; and "[w]hether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime, the strength of the evidence and the defendant." § 565.035.3.

There is no evidence that the jury imposed the sentence of death under the influence of passion, prejudice, or any other arbitrary factor.

 As determined above, there was sufficient evidence to support the aggravating circumstances under §§ 565.032.2(4) and 565.032.2(11) in that appellant obviously committed the murder during a robbery and then repeatedly returned to Mrs. McDonald's apartment for more items. In addition, the state introduced evidence of appellant's prior plea of guilty to murdering Mr. Gianino in May of 1971. *See* § 565.032.2(1).

 The Court has compared Missouri cases where defendant had a prior conviction for first degree murder, murdered the victim for pecuniary gain, murdered the victim in the course of a robbery, or possessed a combination of the three aggravating circumstances. *See State v. White,* 813 S.W.2d 862, 866–67 (Mo. banc 1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1193, 117 L.Ed.2d 434 (1992); *State v. Powell,* 798 S.W.2d 709, 716 (Mo. banc 1990), *cert. denied,* 501 U.S. 1259, 111 S.Ct. 2914, 115 L.Ed.2d 1077 (1991); *State v. Kilgore,* 771 S.W.2d 57, 68 (Mo. banc), *cert. denied,* 493 U.S. 874, 110 S.Ct. 211, 107 L.Ed.2d 164 (1989); *State v. Griffin,* 756 S.W.2d 475, 489 (Mo. banc 1988), *cert. denied,* 490 U.S. 1113, 109 S.Ct. 3175, 104 L.Ed.2d 1036 (1989); *State v. Malone,* 694 S.W.2d 723, 725 (Mo. banc 1985), *cert. denied,* 476 U.S. 1165, 106 S.Ct. 2292, 90 L.Ed.2d 733 (1986); *State v. Laws,* 661 S.W.2d 526 (Mo. banc 1983), *cert. denied,* 467 U.S. 1210, 104 S.Ct. 2401, 81 L.Ed.2d 357 (1984); *State v. Stokes,* 638 S.W.2d 715 (Mo. banc 1982), *cert.*

*denied,* 460 U.S. 1017, 103 S.Ct. 1263, 75 L.Ed.2d 488 (1983). The circumstances in those cases and the present case are similar. The sentence of death in this case is the same and is not excessive or disproportionate.

Appellant sought and was granted leave to file a pro se brief. Review of each point reveals that none is meritorious.

Affirmed.

All concur.