STATE of Missouri, Respondent,

v.

Ernest Lee JOHNSON, Appellant.

No. 78282.

Supreme Court of Missouri,
En Banc.

May 26, 1998.

Loyce Hamilton, Asst. Public Defender, St. Louis, for Appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Christine M. Blegen, Asst. Atty. Gen., Jefferson City, for Respondent.

WHITE, Judge.

A jury convicted defendant Ernest Lee Johnson of three counts of murder in the first degree. The jury recommended the sentence of death for each of the three convictions. The trial court sentenced Johnson in accordance with the jury's recommendation. Johnson's pro se Rule 29.15 motion for postconviction relief and the amended motion filed by appointed counsel were overruled after an evidentiary hearing. This Court has exclusive jurisdiction over the consolidated appeal.[1] We affirm the convictions and the denial of postconviction relief as to the convictions. We reverse the denial of that part of the Rule 29.15 motion pertaining to the penalty phase trial, vacate all three sentences of death, and remand for new penalty phase proceedings.

### FACTS

This Court reviews the facts in the light most favorable to the verdict.[2] At eleven o'clock, the morning of Saturday, February 12, 1994, Ernest Johnson bought a bottle of beer and a package of cigarettes at a Columbia, Missouri, convenience store of which he was a frequent customer. He went to the store a second time later that day, but did not make a purchase. On one of these trips, he questioned the cashier about who would be working the next shift. The cashier told Johnson that she would be relieved at 5:00 p.m. by Mabel Scruggs and that the store would close at 11:00 p.m. Johnson left and returned a short time later, but stayed only a few minutes before leaving again. Just before the shift change at 5:00 p.m., Johnson went to the store a fourth time, this time carrying a book bag over his shoulder. The cashier noticed Johnson staring at her while she deposited the money from her shift into the store safe. He did not buy anything.

Johnson went to his girlfriend's house and purchased a twenty-dollar rock of crack cocaine from his girlfriend's eighteen-year-old son, Rodriguez Grant. Johnson left and then later returned to buy two more rocks. He asked Rodriguez to lend him the .25 caliber pistol Johnson had given to him a couple of weeks earlier in exchange for crack cocaine. Rodriguez agreed, and he and Johnson test-fired the pistol in the back yard. Johnson returned the gun a while later, claiming that it did not work. Still later, Johnson retrieved the gun and left again, wearing layers of clothing, a mask over his face, and black tennis shoes. Since January of 1994, Johnson had confided to Rodriguez his plans to hold up the convenience store, locking all but one employee in the back room and having the remaining employee open the safe.

The next time Johnson returned to the house, from the direction of the convenience store, around 11:45 p.m., his face and clothes were spattered with blood. He came in through the back door and went downstairs to Rodriguez's room. Johnson gave the pistol back to Rodriguez. Johnson then cleaned his tennis shoes, took off his clothes, put the clothes into a trash bag, and told his girlfriend's sixteen-year-old son, Antwane Grant, to get rid of the bag. Johnson had a large amount of money sorted by denomination, and he and Rodriguez counted it. Johnson then hid the money in an air vent. Rodriguez went back upstairs and soon smelled

---

1. Mo. Const. art. V, section 3.

2. *State v. Shurn*, 866 S.W.2d 447, 455 (Mo. banc 1993).

something burning. On returning downstairs, he found Johnson burning paper.

At 1:12 a.m. the following morning, a deputy sheriff responded to a call to check on the convenience store for the possibility of a disturbance involving weapons. The store lights were still on. Through the windows, the officer saw that the cash register was open and the money vault was out and in the middle of the floor. He observed blood smears on the front door lock. City police officers arrived with keys. Upon entering, they discovered two dead bodies and a .25 caliber shell casing in the bathroom. Another body and another .25 caliber shell casing were found inside the walk-in cooler. The safe was empty.

All three victims were store employees: Mary Bratcher, age 46; Fred Jones, age 58; and Mabel Scruggs, age 57. Each victim died from head injuries that were consistent with a bloody hammer found at the scene. In addition, Mary Bratcher suffered at least ten stab wounds to her left hand consistent with a bloody flat-head screwdriver found in a field near the store, and Fred Jones suffered a nonfatal, facial gunshot wound. Police officers also found a bloody Phillips screwdriver, a pair of gloves, a pair of jeans, and a brown jacket in the field next to the store.

Hair on the gloves was consistent with that of Mabel Scruggs. Blood on the gloves was consistent with that of Mabel Scruggs or Fred Jones. Hair on the jacket was consistent with that of Fred Jones. Blood on the jacket was consistent with a mixture of the blood of all three victims.

Later the same morning that the bodies were discovered, Johnson went to a shopping mall and made over $200 in cash purchases. After he returned to his girlfriend's house, police officers arrived asking for any information about the murders. Johnson initially refused to speak with the officers, but eventually agreed to accompany them to the police station. The interviewing officer did not believe Johnson's alibi and read him his *Miranda*[3] rights. Johnson then gave conflicting versions of his alibi and became depressed whenever the convenience store was mentioned. He stated that he did not care if the officers shot him. At one point he said, "It took more than one man to do that job."

A search warrant for his girlfriend's house was obtained. The police found a bag containing $443; coin wrappers; partially burned checks, coupons, and a cash register receipt—all bearing the convenience store's name; a live .25 caliber bullet; and a black pair of tennis shoes with the same company logo as the bloody shoeprints found inside the store.

Johnson was placed under arrest and taken to the booking room. Upon seeing Rodriguez Grant in a holding cell, Johnson stated, "That boy didn't have anything to do with this. None of those boys did." When asked how he knew this information, he responded, "I know they weren't there."

Antwane Grant led the police to the park where he had hidden, at Johnson's direction, a .25 caliber semi-automatic pistol, 17 live rounds of .25 caliber ammunition, a sweat shirt, a pair of sweat pants, a hooded jacket, two stocking caps, and two pairs of socks. Antwane identified the clothes—and the black tennis shoes found at the house—as those Johnson had been wearing the evening of the murders.

Blood found on the sweat shirt was consistent with that of Fred Jones. Blood on the hooded jacket was consistent with that of Fred Jones or Mabel Scruggs. Some hair on one of the stocking caps was consistent with Fred Jones's hair and some was consistent with Johnson's hair.

## GUILT PHASE

### I. DIRECT APPEAL

#### A. Voir Dire

##### 1. Plea Agreements of Codefendants

■ Johnson argues that the trial court erred in allowing the State to question the veniremembers as to their feelings regarding the credibility of State witnesses that testify pursuant to a plea agreement. The State

---

**3.** *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

made the following remarks during the general voir dire:

Ladies and gentlemen, two of the State's witnesses in this case, Antwane Grant and Rodriguez Grant, were charged with different but related offenses due to activities they engaged in before and after the murders for which the defendant is charged. In exchange for Rodriguez Grant's truthful testimony in this case, the State has agreed to recommend a sentence of 10 years in prison for aiding and abetting Ernest Johnson before the defendant allegedly committed a robbery. . . .

And in exchange for Antwane Grant's truthful testimony in this case, the State has agreed not to prosecute him for two charges of tampering with evidence committed after the defendant allegedly perpetrated the offenses. . . .

[Is] there any member of this panel, just based on that, [who] would refuse to listen to and consider the testimony of these two witnesses because of feelings that the State should never make such agreements in return for testimony?

▉ Rulings on voir dire questions will not be disturbed absent a showing of abuse of the trial court's discretion.[4] Johnson concedes that review of this issue is further restricted to that of plain error, due to the lack of a timely objection. He must, therefore, demonstrate that "the action of the trial court was not only erroneous, but that the error so substantially impacted upon his rights that manifest injustice or a miscarriage of justice will result if the error is left uncorrected."[5] The general rule is that it is error to tell a jury about codefendants who have pleaded guilty because it taints the trial with the unfair implication of guilt by association.[6] Under certain circumstances, however, such a disclosure during voir dire may not be prejudicial, especially where the defendant has opportunity to cross-examine the codefendants during the trial.[7] The determination of prejudice is necessarily made on a case-by-case basis.[8]

▉ Voir dire is the "most practical method for probing the minds of the prospective jurors to ascertain those who are fair and impartial and those who are biased and prejudiced."[9] The State is entitled to elicit from prospective jurors any preconceived notions that they might have concerning the law and to ask specifically whether they would refuse to consider the testimony of State witnesses with the benefit of a plea agreement.[10]

As Johnson's codefendants gave eyewitness testimony concerning Johnson's actions immediately before and after the murders took place, the State had the right to discern any prejudice on the panel against testimony procured by the terms of a plea agreement. Once the jury was empaneled, the plea agreements were not used as substantive evidence against Johnson.[11] Both codefendants took the stand at trial, affording Johnson the opportunity for cross-examination. Cross-examination of each codefendant involved questions concerning the details of the plea agreements. For these reasons, and in light of the overwhelming physical evidence against Johnson, this Court finds that no miscarriage of justice occurred.

▉ On a directly related claim, Johnson argues for the first time on appeal that his guilt-phase trial counsel was ineffective for failing to preserve this issue for review other than for plain error. Johnson's failure to raise this issue before the Rule 29.15 motion court waived this claim.[12]

---

4. *State v. Ramsey*, 864 S.W.2d 320, 335 (Mo. banc 1993).

5. *State v. Hornbuckle*, 769 S.W.2d 89, 92–93 (Mo. banc 1989).

6. *State v. Jordan*, 627 S.W.2d 290, 294–95 (Mo. banc 1982).

7. *Id.* at 294.

8. *Id.* at 294–95.

9. *State v. Hobby*, 706 S.W.2d 232, 233 (Mo.App. 1986).

10. *Ramsey*, 864 S.W.2d at 336; *State v. Reynolds*, 837 S.W.2d 542, 544 (Mo.App.1992).

11. *See State v. Yingst*, 651 S.W.2d 641, 643–44 (Mo.App.1983); *State v. Fenton*, 499 S.W.2d 813, 815 (Mo.App.1973).

12. Rule 29.15(d). *See State v. Tokar*, 918 S.W.2d 753, 769 (Mo. banc 1996).

## 2. Death Qualification

Johnson alleged in his motion for new trial that the court erred in sustaining certain objections made by the State during the death-qualification portion of voir dire. He renews his arguments before this Court. A trial court's ruling prohibiting a voir dire question will only be set aside on a showing of "abuse of discretion combined with likely injury" to the defendant.[13] Johnson asked veniremembers whether they had any "feelings" about considering the sentence of life imprisonment for someone convicted of multiple murders. The court sustained the State's objections "as to the way the question was asked." Johnson was then allowed to ask, repeatedly and over the State's objections: "Do you think that if someone is convicted of multiple murders in the first degree, life without the possibility of parole is a punishment you could still seriously consider?"

It is within the court's lawful discretion to reject open-ended questions, particularly those about "feelings."[14] Moreover, the court consistently allowed Johnson to rephrase questions when they strayed too far from inquiring into a veniremember's ability to follow the law. This point is denied.

The court also sustained the State's objection to Johnson asking an individual veniremember whether she thought "the death penalty is imposed too little or too much in this country." Although both sides enjoy "broad latitude" during voir dire, there are limits to the scope of permissible examination.[15] It is within the court's discretion to limit vague questions concerning beliefs and thoughts as to issues not directly related to a juror's ability to follow the law.[16]

Johnson then asked of the same veniremember, "where the conviction is done, going into the penalty phase, would you be leaning in the direction of the death penalty,

going in?" The court sustained the State's objection "as to which way she would be leaning." Johnson then was allowed to ask her if "the State just got up and did aggravators, and the defense lawyers just didn't do anything, presented no evidence, would that make it more difficult for you to consider a punishment of life imprisonment without the possibility of parole?" Contrary to Johnson's assertions, he was not foreclosed from inquiring into the veniremember's ability to follow the law. This point is denied.

Johnson next contends that he was not allowed to thoroughly examine the veniremembers as to their ability to consider mitigating evidence. Johnson asked a venireperson whether there were "certain things that you don't think should be a factor." He answered, "Things that happened, childhood and things like that." The State objected, and the court sustained the objection as to that question. The court then allowed Johnson to ask, over the State's objection, "If the only kind of mitigating evidence presented in any given case were, say, evidence about an individual's childhood, would you consider that as mitigating evidence?" Johnson went on to ask other veniremembers about mitigating evidence, including a defendant's childhood history. Johnson's claim is without merit.

## 3. State's Challenges for Cause

Johnson argues that the trial court erred in granting five of the State's challenges for cause. He claims that although the veniremembers in question may have appeared uncomfortable or hesitant during death-qualification, their responses fell short of manifesting "irrevocable commitment" to voting against the death penalty.

A prospective juror's qualifications are not conclusively determined by any single response, but from the entire voir dire examination.[17] As the trial court has the

13. *State v. Bannister,* 680 S.W.2d 141, 145 (Mo. banc 1984).

14. *State v. Kreutzer,* 928 S.W.2d 854, 864 (Mo. banc 1996).

15. *State v. Jones,* 749 S.W.2d 356, 360 (Mo. banc 1988).

16. *See Kreutzer,* 928 S.W.2d at 864.

17. *Id.* at 866; *State v. Brown,* 902 S.W.2d 278, 285 (Mo. banc 1995).

benefit of evaluating firsthand the demeanor and responses of each veniremember as the voir dire progresses, the trial court's ruling as to whether a veniremember is committed to follow the law will not be disturbed absent a finding of abuse of discretion.[18] A general aversion to the death penalty does not by itself disqualify a veniremember.[19] Cause for removal exists if a prospective juror's views on capital punishment would "prevent or substantially impair the performance of [that person's] duties as a juror in accordance with [the jury] instructions and [the juror's] oath."[20]

### a. Peggy Edwards

▇▇▇ In response to the question of whether the veniremembers could seriously consider imposing the death penalty, Peggy Edwards responded, "I'm having quite a bit of stress about thinking that I would be the one to say that someone else wouldn't live." When asked if she could sign a death verdict as foreperson, she stated, "It would be a very difficult thing to do. I'm just under a lot of stress about it. I'm not real sure whether I could or not." Edwards also stated that there was a possibility that she would hold the State to a higher burden than beyond a reasonable doubt—that of "complete proof." When the State asked her directly whether her views on the death penalty would substantially impair serious consideration of it, Edwards replied, "It's possible it could, yes," and "I'm one of those people that has always thought I believed in the death penalty until it comes down to me actually saying, yes, I should go ahead and do it," followed by "I'm not real sure on that until it actually would come down to the moment of, yeah, you've got to make the decision now. I'm just not real sure."

Edwards later stated that she did believe she could follow the court's instructions and could stand up in court and say "Yes, this is my verdict" in the event of a unanimous recommendation of death. Viewed within the context of the entirety of Edwards's responses, however, these two statements do not prove that the trial court abused its discretion in finding that her commitment to follow the law was substantially impaired with respect to the State's burden of proof or the serious consideration of both life imprisonment and the death penalty.[21]

### b. Angela Leap

▇▇▇ Angela Leap confessed that she had "mixed emotions" about the death penalty, but that depending on the facts of the case, she could consider it as an option. When asked if her views would substantially impair the serious consideration of the death penalty, she responded, "It might make it difficult, yes," and "I would have trouble sentencing someone to death, yes." She stated that she would "[p]robably yes" hold the State to a higher burden of proof in the penalty phase than the guilt phase.

Although the court found that Johnson later rehabilitated Leap as to the burden of proof, the court went on to sustain the State's challenge, noting for the record that Leap was "very emphatic in answering the prosecutor's question that her feeling about the death penalty would substantially impair her ability to serve as a juror." There is no evidence in the record of abuse of discretion.

### c. Philip Moore

▇▇▇ Philip Moore initially stated that it would be difficult for him to be fair and impartial in the guilt phase with the knowledge that the State would seek the death penalty for a first-degree murder conviction. He added that once guilt had been determined, however, he could follow the law in the penalty phase, and that in some cases, he felt the death penalty was appropriate. Later in the voir dire, however, he admitted that he could not sign a verdict recommend-

---

18. *Wainwright v. Witt*, 469 U.S. 412, 424–26, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985); *Kreutzer*, 928 S.W.2d at 866.

19. *Witherspoon v. Illinois*, 391 U.S. 510, 522, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968).

20. *Wainwright*, 469 U.S. at 424, 105 S.Ct. 844 (quoting *Adams v. Texas*, 448 U.S. 38, 45, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980)).

21. *See State v. Lyons*, 951 S.W.2d 584, 592 (Mo. banc 1997); *State v. Smith*, 944 S.W.2d 901, 914 (Mo. banc 1997).

ing death. It is reasonable for a trial court to conclude that a veniremember's unequivocal statement of his inability to sign a death warrant amounts to a substantial impairment to performing the duties of a juror, specifically the serious consideration of the full range of punishment at law, including the death penalty.[22] There is no evidence of abuse of discretion.

#### d. Debra Tapp

■ Debra Tapp initially stated that although she had problems with the death penalty, she could seriously consider it. Later in the voir dire, however, she stated twice that she would have difficulty imposing the death penalty and twice more that her views would "substantially impair" her ability to even seriously consider it. She did eventually state that on certain facts, she could sign a death verdict, but it would be "a little hard." She also stated that she "probably would be able to deal with life in prison a little easier." The record does not reflect that the trial court abused its discretion in finding Tapp's ability to seriously consider the death penalty to be substantially impaired.

#### e. Valerie Twenter

■ Although Valerie Twenter originally stated that she could follow the court's instructions, she later answered that could not consider the death penalty. Then later still, she replied that she could seriously consider both punishments if the State proved its case beyond a reasonable doubt. Again, no single answer is dispositive of a veniremember's commitment to follow the law.[23] Absent a showing that the trial court abused its discretion in finding that a veniremember's ability to consider the full range of punishment at law is substantially impaired, the ruling will

not be disturbed.[24] There is no evidence of abuse of discretion.

### B. Instructions

#### 1. Voluntary Intoxication

■ The court instructed the jury with MAI–3d 310.50[25]:

The state must prove every element of the crime beyond a reasonable doubt. However, in determining the defendant's guilt or innocence, you are instructed that an intoxicated or a drugged condition whether from alcohol or drugs will not relieve a person of responsibility for his conduct.

Johnson objected, challenging the constitutionality of the instruction. Johnson argues that the instruction lessens the State's burden of proving that he knowingly caused each death after deliberation. Pursuant to *State v. Erwin,* 848 S.W.2d 476 (Mo.1993).[26] which held a prior version of the instruction[27] to be unconstitutional, explicitly because of the concern Johnson now presents, MAI–CR3d 310.50 was rewritten as above set forth to emphasize to the jury that evidence of voluntary intoxication does not alleviate the State's burden of proof in any way.[28] This Court upheld the new instruction as constitutional in *State v. Taylor,* 944 S.W.2d 925 (Mo.1997) and Johnson's conclusory point on appeal does not assert any convincing argument for reexamination of the issue.[29]

#### 2. Reasonable Doubt

Johnson made a timely objection, preserved in his motion for new trial, to the following language of the instruction submitted to the jury on reasonable doubt: "Proof beyond a reasonable doubt is proof that leaves you *firmly convinced* of the defendant's guilt. The law does not require proof that *overcomes every possible doubt.*"[30] He

---

22. *Kreutzer,* 928 S.W.2d at 867.

23. *Id.* at 866.

24. *Id.*

25. (Supp.1995).

26. 848 S.W.2d 476 (Mo. banc 1993).

27. "You are instructed that an intoxicated condition from alcohol will not relieve a person of responsibility for his conduct." *Id.* at 481.

28. *State v. Taylor,* 944 S.W.2d 925, 936 (Mo. banc 1997).

29. *See id.*

30. MAI–CR 3d 302.04 (emphasis added).

argues before this Court that the emphasized language defining "reasonable doubt" unconstitutionally undermines the standard. This Court has consistently upheld this instruction.[31] Johnson requests reexamination of the issue, but fails to assert grounds for doing so.

## II. RULE 29.15 MOTION

 Johnson was represented at trial by Nancy McKerrow and Janice Zembles. Although they often worked together throughout the trial, Nancy McKerrow made the ultimate decisions with respect to the guilt phase. Relief on an ineffective assistance of counsel claim is appropriate if the movant shows that his "counsel's representation fell below an objective standard of reasonableness" and that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome."[32] We review the motion court's findings and conclusions for clear error.[33] "The trial court's findings and conclusions are clearly erroneous only if, after a review of the entire record, the appellate court is left with the definite and firm impression that a mistake has been made."[34]

### A. Opening Statement

 Johnson now argues, for the first time in any pleading, that his counsel's representation fell below an objective standard of reasonableness when she stated "Ernest Johnson did cause the deaths of Mary Bratcher, Fred Jones, and Mabel Scruggs, but he did not do so after deliberation." Rule 29.15(d) requires that all grounds for setting aside the postconviction motion be contained in the motion and that the movant acknowledge in a motion timely filed his "un-

derstanding that the movant waives any claim for relief known to the movant that is not listed in the motion." "The effect of Rule 29.15(d) is to bar all claims not raised in a timely filed pleading."[35]

Johnson also alleges in his brief to this Court—again, for the first time in any pleading—that his counsel's performance was substandard when she mentioned Johnson's "crack-filled mind," because voluntary intoxication is not a defense to murder. Johnson's failure to preserve this issue is fatal to his claim.[36] Both claims are procedurally defaulted.

### B. Failure to Call Witnesses

#### 1. Dr. Parwatikar

 Johnson alleges that he was deprived of effective counsel when McKerrow failed to call Dr. Sam Parwatikar, a licensed psychiatrist with an emphasis in forensic psychiatry. McKerrow arranged for her paralegal to contact Dr. Parwatikar to examine Johnson for any sign of mental disease, defect, or disorder. Dr. Parwatikar concluded that Johnson did not suffer from mental disease or defect. He reported his findings back to the paralegal. At the motion hearing, McKerrow testified that her decision not to call Dr. Parwatikar was based on the fact that he found no mental disease or defect.

To pursue a defense of lack of responsibility, a defendant must prove that "at the time of such conduct as a result of mental disease or defect he was incapable of knowing and appreciating the nature, quality or wrongfulness of his conduct."[37] Dr. Parwatikar expressly communicated that he could not aid Johnson's defense in the guilt phase. If called, he would have testified that Johnson did not suffer from mental disease or defect. Johnson has the burden of demonstrating

**31.** *See State v. Debler,* 856 S.W.2d 641, 652 (Mo. banc 1993).

**32.** *Strickland v. Washington,* 466 U.S. 668, 688, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

**33.** Rule 29.15(j).

**34.** *State v. Ervin,* 835 S.W.2d 905, 928 (Mo. banc 1992).

**35.** *State v. Twenter,* 818 S.W.2d 628, 641 (Mo. banc 1991). *See State v. Tokar,* 918 S.W.2d 753, 769 (Mo. banc 1996).

**36.** Rule 29.15(d).

**37.** Section 562.086, RSMo 1994. All statutory references are to RSMo 1994.

that Dr. Parwatikar's testimony would have benefited his defense.[38] The motion court did not clearly err in denying relief on this point.

Johnson also faults McKerrow for not providing Dr. Parwatikar with Johnson's complete social history so that he could make an accurate diagnosis. After reviewing the investigative reports on Johnson's background, however, Dr. Parwatikar testified at the motion hearing that this information would not have changed his diagnosis save to bolster it. This point is denied.

### 2. Dr. Bernard

■ Johnson contends that his counsel's performance fell below an objectively reasonable standard when she did not call Dr. Carol Bernard, a psychologist. Dr. Bernard was instructed to conduct a personality assessment and to assess Johnson's intellectual and cognitive functioning. She interviewed Johnson for a total of eight hours. She reported to McKerrow after the tests had been administered, but they had not yet been scored. McKerrow did not contact Dr. Bernard again for the test results.

Dr. Bernard testified at the motion hearing that there was one test that she did not complete and another for which she received invalid results. She was able to conclude from IQ testing, however, that Johnson was in the first or second percentile—the borderline mentally retarded range—meaning that ninety-eight percent of those tested perform at a higher level. She suspected that his reading ability was below the sixth-grade level. She also noted that the way that he reversed letters and words indicated that he had a learning disability. She concluded that on the night of the crime, Johnson was suffering from cocaine intoxication. Dr. Bernard testified that after arriving at her initial diagnosis, she underwent surgery, but would have been available to testify at trial.

Even if McKerrow had followed up on the valid tests Dr. Bernard was able to complete, and if McKerrow had presented the results

at trial, this evidence would not have provided a defense to murder in the first degree. Voluntary cocaine intoxication is not a defense.[39] Moreover, the absence of Dr. Bernard's testimony did not prejudice Johnson in light of the overwhelming amount of evidence that Johnson did knowingly cause the deaths of the three victims after deliberation. This point is denied.

### 2. Other Witness Claims

■ Johnson also argues that his counsel was ineffective for failing to call witnesses to support the defense of lack of deliberation, to attack the credibility of his codefendants' testimony, and to attack the testimony of the State's hair analysis expert who testified that hair consistent with Johnson's hair was found on one of the stocking caps that Antwane Grant hid in a park at Johnson's direction. Johnson has waived these claims by his failure to include them in his pro se 29.15 motion or the amended motion filed by appointed counsel.[40]

### C. Failure to Perform Neurological Testing

■ Johnson contends that McKerrow's failure to arrange for him to undergo neurological testing fell below an objective standard of reasonableness. At the motion hearing, Johnson presented testimony of Dr. Dennis Cowan, a neuropsychologist who had examined Johnson posttrial. He concluded that Johnson's brain functioning was within the brain damaged range at the mild degree of impairment, as a result of congenital abnormalities, multiple head injuries, and polysubstance abuse. Dr. Cowan explained that this impairment manifested itself in Johnson's everyday life in slow-thinking, a short attention span, problems with verbal comprehension, a poor memory, and difficulty in responding to complex situations.

The motion court denied relief. We find no clear error. The burden is on Johnson to prove "that such experts existed at the time of trial, that they could have been located

**38.** *State v. Davis,* 814 S.W.2d 593, 603–04 (Mo. banc 1991).

**39.** Section 562.076.

**40.** Rule 29.15(d).

through reasonable investigation, and that the testimony of these witnesses would have benefited movant's defense." [41] Not only did Johnson fail to present evidence to the motion court concerning Dr. Cowan's availability, or the availability of any neurologist who would have been willing to testify on Johnson's behalf, Dr. Cowan's testimony did not address whether or not Johnson's impairment amounted to the defense of mental disease or defect. The motion court did have before it Dr. Parwatikar's testimony that he found no evidence of mental disease, defect, "cognitive deficit or any objective neurological finding to warrant neuropsychological testing." We affirm the motion court's denial of relief on this point.

### D. Closing Argument

██ Johnson alleges in his brief before this Court—the first time the issue has been raised in any pleading—that his counsel did not adequately present the defense of lack of deliberation to the jury in her closing argument. Johnson's tardiness has waived the point.[42]

This Court affirms all three convictions for murder in the first degree, as well as the denial of postconviction relief regarding the guilt phase.

### PENALTY PHASE

Johnson directly appeals all three death sentences and also appeals the denial of postconviction relief based on the performance of his penalty phase counsel. Our discussion focuses on the claim that mandates a new penalty phase trial.

### I. RULE 29.15 MOTION

Janice Zembles was the attorney who made the ultimate decisions throughout the penalty phase. Johnson claims that Zembles's failure to present the testimony of any medical expert who had personally examined Johnson, specifically that of Dr. Sam Parwatikar, falls short of the skill and diligence a reasonably competent attorney would exercise under similar circumstances. Johnson

contends that but for this error, there exists a reasonable probability that he would have received a life sentence instead of a death sentence. After review of the findings and conclusions of the motion court, we find that it was clear error to deny postconviction relief as to the penalty phase. We remand the cause for new penalty phase proceedings.

### A. Objective Standard of Reasonableness

██ Dr. Parwatikar, a licensed psychiatrist with an emphasis in forensic psychiatry, was hired to examine Johnson for any sign of mental disease, defect, or disorder. Dr. Parwatikar reviewed the police reports and conducted a two-and-a-half hour interview with Johnson. Dr. Parwatikar concluded that at the time of the crime Johnson did not suffer from mental disease or defect, but did suffer from "cocaine intoxication delirium," a mental disorder precipitated by excessive cocaine intake.

After arriving at his diagnosis, Dr. Parwatikar attempted several times, unsuccessfully, to speak with Johnson's attorneys. He eventually reported the above findings to a paralegal and offered to testify on Johnson's behalf if the case reached the penalty phase.

Zembles scheduled Dr. Parwatikar as a defense witness. She later told the court that she expected Dr. Parwatikar to testify as to Johnson's mental health and his mental state at the time of the crime. She sought to introduce this evidence to support the statutory mitigating factor, "The capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired." [43] She testified at the motion hearing that she "absolutely" intended to call Dr. Parwatikar to give the jury "insight into Ernest's state of mind ... who Ernest was psychologically and intellectually and what kind of difficulties he had, and most importantly, he would have provided foundation" for the doctor of pharmacy offered as an expert witness on the effects of longterm cocaine use. Zembles also testified that part

---

**41.** *Davis,* 814 S.W.2d at 603–04.

**42.** Rule 29.15(d).

**43.** Section 565.032.3(6).

of her strategy in calling Dr. Parwatikar was so that the "jury could hear from Ernest without Ernest having to take the stand."

Zembles blamed "communication problems" for the lack of Dr. Parwatikar's testimony. She testified that she did not contact Dr. Parwatikar before the guilt phase began because of her work for two other capital defendants, one of whom she was still defending at trial the week before Johnson's trial was scheduled to begin. Zembles asked her cocounsel, McKerrow, to move for a continuance. McKerrow did so, but the motion was denied. Zembles never moved for a continuance thereafter. Upon commencement of the guilt phase of Johnson's trial, Zembles instructed three different people from her office to contact Dr. Parwatikar to set up a meeting. Eventually, a teleconference was set up for nine o'clock, the evening before the conclusion of the guilt phase. Zembles claims that she was home at the appointed time, but never received a call, though she found out later that Dr. Parwatikar insisted he did call and no one answered. In any case, Zembles did not attempt to call Dr. Parwatikar that evening. A second teleconference was set up for the following evening, but Zembles missed it awaiting the jury's verdict in the guilt phase. Dr. Parwatikar left a message on Zembles's answering machine, but not a telephone number. Zembles described the message as "not rude but curt" and "testy," "it was easy for me to tell he was irritated."

The next day, the penalty phase began. Zembles left instructions with her secretary to contact Dr. Parwatikar in St. Louis as early as possible so he would have time to drive to Columbia to testify. Before the trial started, the State informed the court it would complete its case before noon. When the court asked Zembles if the penalty phase would go longer than a day, she answered that she "wouldn't be surprised" if the case would go to the jury that very afternoon. That morning, while the State was presenting its evidence, Zembles received a note that Dr. Parwatikar would not make the two-hour drive to Columbia until he talked to Zembles personally, but that Zembles could contact him over the noon hour. Zembles

would later tell the court that she got the impression from her secretary who had contacted Dr. Parwatikar's secretary, that Dr. Parwatikar was "down right hostile," "somehow believing that I have not kept up my end of the bargain to get in touch with him, to spend time with him on the phone talking about his testimony." Zembles testified at the motion hearing that this information caused her to "throw up my hands and say 'I'm going without him.'" She also told the motion court "that's when I should have asked for a continuance" and "I cannot imagine why I didn't just ask for a brief continuance or a recess or something to try and get a hold of the man, but I didn't."

The only medical expert Zembles called was Dr. William Watson, a doctor of pharmacy. As he had never examined Johnson, nor was he licensed in psychiatry, he was not allowed to testify as to Johnson's mental state at the time of the crime or describe the mental disorder of cocaine intoxication delirium.

When the court refused to submit the statutory mitigating factor regarding substantial impairment of Johnson's capacity to "appreciate the criminality of his conduct or to conform his conduct to the requirements of law," Zembles moved for a mistrial, claiming that the denial of the motion for continuance before the guilt phase prevented her from contacting Dr. Parwatikar.

The court responded:

Well, the Court would note that here we are at the end of the instruction conference with nothing left but to argue the case tomorrow morning, and this is the first time the Court has heard about this matter. I have heard no indication at no time you talked to Dr. Parwatikar ...

The Court would note that we've had witnesses this afternoon. We were still going on the evidence until roughly 3:30 this afternoon. And if you were looking at 12:30 or a quarter till 1:00, it's roughly 120 miles from here to St. Louis. But the fact of the matter is, I mean, we've gone through this period of time the last several days, and I haven't heard anything about it. You were around here last night while the jury was deliberating between 5:30,

and, I think the jury came back on my docket sheet at 10:10 or something like that.

But, you know, I'm hearing about this for the first time, and your request for a mistrial will be denied.

At the motion hearing, Zembles was asked, "Did you have any strategic reason for not contacting Dr. Parwatikar?" to which she replied, "No." In response to the question, "So was it a strategic reason that you did not want Dr. Parwatikar to testify?" Zembles answered "No. No. Not at all."

Counsel is strongly presumed to have made all significant decisions in the exercise of reasonable professional judgment.[44] The record in this case, however, demonstrates that Zembles was not acting in accordance with a reasonable trial strategy. The record reflects that Dr. Parwatikar's testimony was the cornerstone of Zembles's penalty phase strategy. Zembles had not planned for any other scheduled witness to cover the majority of Dr. Parwatikar's testimony, that portion devoted to Johnson's mental state at the time of the murders. Yet when Zembles was notified during the presentation of the State's case that Dr. Parwatikar wanted to speak with her personally, she did not move for a continuance. She decided instead to proceed with the same theory of defense, but without his expert testimony. This is documented by her persistence in proposing to instruct the jury on the statutory mitigating circumstance on substantial impairment and her unsuccessful attempts to elicit opinions from a doctor of pharmacy, who had never had any personal contact with Johnson, as to Johnson's psychological state at the time of the murder.

Zembles's conduct does not measure up to an objective standard of reasonableness. She failed to solidify arrangements with the scheduled key witness in the penalty phase of a capital trial as to when he would testify—a witness whose office was located approximately a two-hour drive from the courthouse. Before she began presenting her case, she was notified that the key witness would not appear without first speaking to her personally. Instead of moving for a continuance or making tactical changes in her theory of defense, Zembles gambled on the chance that she could reproduce the evidence of a licensed psychiatrist who had personally interviewed Johnson through hypotheticals by a doctor of pharmacy—who had never had any personal contact with Johnson—about Johnson's mental state, without the foundation of any psychiatric evaluation of Johnson. We find that under these circumstances, hindsight aside, and evaluating the conduct from Zembles's perspective at the time, her performance fell short of the skill and diligence that a reasonably competent attorney would exercise under similar circumstances.

### B. Prejudice

Dr. Parwatikar testified at the motion hearing that he would have appeared had he been called as a witness. He would have testified that, after personally interviewing Johnson and reviewing the police reports, he had concluded that Johnson suffered from the mental disorder of cocaine intoxication delirium at the time of the murders.

He would have explained the disorder to the jury as follows:

> Cocaine ... is a stimulant drug which [Johnson] has been using since the teen age. And particularly he has been using crack cocaine, which is a short-acting cocaine. This particular stimulant affects the brain in two different ways. One is it actually changes the neurochemical pattern in the brain. There are three type of chemicals that are involved. One is called dopamine, the other serotonin ... and the third one is norepinephrine ...

> These three neurochemicals are extremely essential for a person to function when they are in the balance. However, when a person uses cocaine in excess, these three chemicals are thrown out of kilt. That means that there are some excesses of all these neurochemicals in the brain that causes the person to have first of all, what is known as a, quote unquote, high.

---

**44.** *Strickland v. Washington,* 466 U.S. 668, 690, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

And then what happens is that the person becomes very agitated, irritable, and even though there is a superficial feeling of euphoria or happiness, eventually that euphoria, which is really neurochemically based, the person starts to become very irritable and sometimes become very paranoid that people are after them. . . . And that can end up in psychosis.

The second way the cocaine affects is that when it is used in long term, it makes . . . the brain cells, very sensitive to any type of excitation because they become fragile. It has a sort of a seizure effect in the sense that any kind of excitation can throw a person into anxiety . . .

. . .

Intoxication delirium is a condition when a person is intoxicated with cocaine to the extent that he has changes in moods, changes in personality, and changes in judgment. And these are all related to the changes in perception that the person has.

. . .

[Changes in] personality basically means inability to delay gratification, having difficulty in relating to stressful situations, having inappropriate judgments. . . . And in terms of perceptions of reality and judgment would be impulsive acting out, perceiving that he is in trouble when he might not be, wanting to use more and more cocaine . . .

What the jurors did hear was a representative from each victim's family testify about the family's tragic and senseless loss. The State also reminded the jury of Johnson's prior felony convictions: burglary, 1978; stealing a motor vehicle, 1979; robbery in the second degree and attempted burglary in the second degree, 1981; and burglary in the second degree, 1991.

On Johnson's behalf, the jurors were presented with testimony of Johnson's mother, brother, sister, parole officer, and a treatment coordinator from a halfway house where Johnson had lived. They heard of Johnson's longterm substance abuse and that of his mother and siblings; that Johnson was abandoned by his mother as a child; that he grew up in destitute conditions; that he was physically abused by the man his father left him with for long periods of time during his childhood; that Johnson had suffered a head injury around the age of eight that went untreated; that he took special education classes at school; and that he never finished the ninth grade. The jurors also heard that Johnson was generally a softspoken, nonviolent person, dedicated to his family and friends, and was planning on entering a treatment program when the murders occurred.

As noted above, Dr. Watson, the doctor of pharmacy called by Zembles, had never examined Johnson and was not allowed to testify as to Johnson's mental state at the time of the murders, nor was he allowed to describe the mental disorder of cocaine intoxication delirium. He was allowed to tell the jury of the general effects of cocaine, including that, to cocaine addicts, "Everything else becomes irrelevant, other than getting more drug and continually trying to recapture that first high."

The Court refused to submit to the jury the instruction on substantial impairment. The State commented during closing argument: "What evidence has there really been that cocaine made this man do it? There hasn't been, ladies and gentlemen."

The motion court found that Johnson failed to prove prejudice, presumably because of the aggravating circumstances presented by the State. The jury found the following five statutory aggravating circumstances for each murder: (1, 2) that the murder was committed while Johnson was engaged in the commission of two other unlawful homicides; (3) that Johnson committed the murder for the purpose of receiving money or any other thing of monetary value from the victim or another; (4) that the murder was committed while Johnson was engaged in the perpetration of the felony of robbery; and (5) that the murder was outrageously or wantonly vile, horrible, or inhuman in that it involved de-

pravity of mind.[45]

The circumstances surrounding the deaths of Mary Bratcher, Fred Jones, and Mabel Scruggs were undeniably horrendous. As stated above, this Court affirms all three of Johnson's convictions for murder in the first degree. This Court also finds that the State proved each of the above aggravating circumstances beyond a reasonable doubt. This does not end the evaluation of prejudicial effect, however. The evaluation of the aggravating and the mitigating evidence offered during the penalty phase is more complicated than a determination of which side proves the most statutory factors beyond a reasonable doubt. Moreover, under no circumstances *must* the jury impose a sentence of death.[46]

The penalty phase jury:

shall assess and declare the punishment at life imprisonment without eligibility for probation, parole, or release except by act of the governor:

. . .

If the trier concludes that there is evidence in mitigation of punishment, including but not limited to evidence supporting the statutory mitigating circumstances listed in subsection 3 of section 565.032, which is sufficient to outweigh the evidence in aggravation of punishment found by the trier. . . .[47]

Even if after balancing all the statutory and nonstatutory aggravating and mitigating factors, the jury does not find that the mitigating factors outweigh the aggravating, the jury still has the discretion "under all of the circumstances not to assess and declare the punishment at death."[48]

In analyzing the prejudice of substandard representation, the crucial question is whether there is a reasonable probability that, but for counsel's unprofessional performance, the jurors would have unanimously recommended a sentence of life imprisonment without the eligibility of probation or parole.[49] In analyzing the existence of this reasonable probability, we must consider the weight of evidence supporting each statutory aggravating and mitigating factor on which the jurors would have been instructed had they been presented with Dr. Parwatikar's testimony. We must also consider the impact of Dr. Parwatikar's testimony in the context of all the evidence presented.

Note Three of the "Notes on Use" for MAI–CR3d 313.44A, the instruction on evidence in mitigation, states that statutory mitigating circumstances "should be given on request by the defendant if there is evidence to support the specific mitigating circumstance . . . requested." In Johnson's penalty phase trial, the Court did find that there was evidence to support two statutory mitigating circumstances to be considered for each of the three sentences: whether the murder was committed while Johnson was under the influence of extreme mental or emotional disturbance and whether Johnson acted under extreme duress or under substantial domination of another person.[50]

Had Dr. Parwatikar's testimony been presented to the jury,[51] no legal impediment existed to prohibit the court from also instructing the jury: "As circumstances that may be in mitigation of punishment, you shall consider: . . . Whether the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the

---

45. Sections 565.032.2(2), (4), (11), (7).

46. *See* Section 565.030.4(4).

47. Section 565.030.4(3).

48. Section 565.030.4(4).

49. While there is also the possibility of a hung jury which would require the court to assess and declare punishment at life or death, we do not reach this possibility in our analysis as we find a reasonable probability exists that the jury would have returned an unanimous verdict of life imprisonment. *See* Section 565.030.4.

50. Sections 565.032.3(2), (5).

51. The State had notice that Dr. Parwatikar was scheduled as a penalty phase witness. Rebuttal and surrebuttal testimony in the penalty phase is expressly permitted by statute. Section 565.030.4.

**702** ■ 

requirements of law was substantially impaired."[52]

The submission of a statutory mitigating circumstance necessarily presumes the mental capacity of the defendant was such that he knowingly caused a victim's death after deliberation.[53] Thus, the statutory mitigating circumstance concerning the substantial impairment of a defendant's ability "to appreciate the criminality of his conduct or to conform his conduct to the requirements of law" speaks directly to a mental disorder that falls short of a mental disease or defect and, consequently, falls short of a defense to murder in the first degree.[54] More specifically, this Court has approved of the submission of this statutory mitigating circumstance in the context of voluntary cocaine intoxication.[55]

Even if the court chose not to submit this mitigating instruction, however, the jury would have been permitted to consider Dr. Parwatikar's testimony as mitigating evidence, as every penalty phase jury is instructed, "You shall also consider any facts or circumstances in mitigation of punishment."

While this Court does not presume to know the precise effect Dr. Parwatikar's testimony would have had on the jurors who served on Johnson's trial, this Court is left with the definite and firm impression that the record before us demonstrates that Dr. Parwatikar's testimony would have altered the jurors' deliberations to the extent that a reasonable probability exists that they would have unanimously recommended life imprisonment without eligibility of probation or parole.

### CONCLUSION

For all the foregoing reasons, this Court affirms the convictions and the denial of that part of the motion for postconviction relief relating to the convictions. We reverse the denial of postconviction relief as to the penalty phase, vacate all three sentences of death, and remand for new penalty phase proceedings consistent with this opinion.

BENTON, C.J., and PRICE and ROBERTSON, JJ., concur.

LIMBAUGH, J., concurs in part and dissents in part in separate opinion filed.

COVINGTON and HOLSTEIN, JJ., concur in opinion of LIMBAUGH, J.

LIMBAUGH, Judge, concurring in part and dissenting in part.

I respectfully dissent from that part of the majority opinion reversing the penalty of death. The proposition that defense counsel's failure to call Dr. Parwatikar, the psychiatrist, during penalty phase "falls short of the skill and diligence a reasonably competent attorney would exercise under similar circumstances" is tenuous, given the fact that the doctor's testimony concerning the effects of defendant's hardcore addiction would be as aggravating as it would be mitigating. Juries are not always sympathetic to evidence of substance abuse. That issue aside, there was no showing of prejudice as required under *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). The record, which is to be reviewed in the light most favorable to the verdict, *State v. Storey*, 901 S.W.2d 886, 891 (Mo. banc 1995), and which has the benefit of the Rule 29.15 court's findings and conclusions on the prejudice issue, wholly fails to support the majority's extreme holding "that Dr. Parwatikar's testimony would have altered the juror's deliberations to the extent that a reasonable probability exists that they would have unanimously recommended life imprisonment."

The evaluation of the prejudicial effect of Dr. Parwatikar's failure to testify can best be made by asking three questions: 1) What was the purpose of Dr. Parwatikar's testimony? 2) To what extent was other evidence introduced and argument allowed in furtherance

---

**52.** Section 565.032.3(6). *See, e.g., State v. Wise,* 879 S.W.2d 494, 518 (Mo. banc 1994).

**53.** *See* Section 565.020.1.

**54.** *See* Section 562.086.

**55.** *See Wise,* 879 S.W.2d at 518.

of that purpose? 3) What would Dr. Parwatikar have added?

Obviously, the purpose of Dr. Parwatikar's testimony was to reinforce the point that defendant was intoxicated by cocaine and not in his right mind when he committed the three murders. Although defendant's voluntary cocaine intoxication was no defense to his guilt, and his long-time addiction, as stated, could properly be seen as an aggravating factor, his atrocious conduct, according to defense counsel, was the unfortunate product of his addiction to cocaine, rather than some innate, sociopathic personality that would be more deserving of the death penalty.

This point, despite the absence of Dr. Parwatikar's testimony, was highlighted time and again throughout the penalty phase proceedings and was the central focus of both the evidence and the argument. Defendant was repeatedly depicted as a hardcore, abject addict who had not had the benefit of treatment and who otherwise "was generally a soft-spoken, nonviolent person, dedicated to his family and friends...." In addition, evidence was presented that the defendant had an uncontrollable need for the drug, with the implication that he would do whatever was necessary to satisfy that need, regardless of the consequences. As Dr. Watson, the doctor of pharmacy called as a mitigation witness, so clearly explained: to cocaine addicts, "everything else becomes irrelevant, other than getting more drugs and continually trying to recapture that first high." Pressing the point further, Dr. Watson then told the jury that there was a "positive association" between the use of crack cocaine (the defendant's variation of the drug) and violent behavior -- violence that is usually secondary to the buying and selling of the drug. Beverly Johnson, defendant's sister, was then called to give a first-person account of the effects of cocaine addiction:

> I've been a three-time loser with crack cocaine.... I would go to the stores and steal stuff for crack... I pushed everybody away from me that I cared about and everything, and I just wanted to do away with myself because I didn't know what to do. And I hurted so bad, so I started selling everything in my house, stealing from my kids and my grandbabies, and stealing from people for crack cocaine. But I took and started lying to my bosses at work... I told lies to anybody I could to get what I wanted. And when that started wearing thin, I started hanging in the streets all the time... Doing whatever I had to do to get, to get high again.... I didn't care what I did to myself, so I didn't care what happens to me, so I was willing to go any length I had to.

Having laid the evidentiary groundwork of the effects of cocaine addiction, defense counsel drove home the point in closing argument:

> Mr. Crane [the prosecutor] apparently wants you to believe, and it may be he'll speak about this again, but he apparently wants you to believe that crack cocaine played no part in the events of February 12th of 1994, that Ernest was, perhaps, just a casual user of crack cocaine.
>
> But that position is really indefensible because we know that Ernest was trying on that very night to pawn his boots to Rod Grant, to pawn a CD player and other articles of clothing to Rod Grant to get more crack cocaine because Ernest didn't have any more money. And he was already in debt to Rod for crack. These are not the acts of a casual user. *It's* [sic] *the acts of somebody who was desperate to get more drug.* (Emphasis added.)

Tying this evidence to the appropriate statutory mitigating circumstance instruction given by the Court, defense counsel stated:

> And the other mitigating circumstance that you can consider is whether Ernest Johnson was under the influence of extreme mental or emotional disturbance. And I think certainly you recognize that somebody who is desperate for drugs is under such mental condition. Beverly Johnson talked to you about that.

Dr. Parwatikar's proposed addition would have added very little to the evidence and argument reviewed above. The thrust of his testimony was to explain the technical, neurological bases behind the symptoms of cocaine intoxication and addiction -- to give scientific reasons for an addict's conduct. But, the symptoms themselves -- inability to

delay gratification, difficulty in relating to stressful situations, inappropriate judgments, and a skewed perception of reality -- are the critical elements of the defendant's proof in mitigation, and the term "cocaine intoxication delirium" is nothing more than scientific jargon for that set of symptoms. These symptoms, which are in large part a matter of common knowledge, were adequately explained to the jury by persons uniquely qualified to do so -- by Dr. Watson, a pharmacological expert, and by Beverly Johnson, an addict herself. Although Dr. Parwatikar would have added details and more elaborate explanations, his testimony was essentially cumulative to the evidence on the main point -- that defendant's conduct was the product of cocaine intoxication rather than a sane and sober mind. Because the testimony was essentially cumulative, the failure to present that testimony was not prejudicial. *See, e.g., State v. Kenley*, 952 S.W.2d 250, 266–68 (Mo. banc 1997) (defense counsel was not ineffective for failing to obtain additional expert testimony on the issue of the effect of substance abuse on defendant's mental state on the night of the murder because the testimony would have been cumulative); *State v. Nunley*, 923 S.W.2d 911, 924 (Mo. banc 1996) (defense counsel was not ineffective for failing to obtain a mitigation expert to prepare a "psycho-social" background investigation where other expert and lay testimony on the same subject had already been offered and additional evidence would have been cumulative).

Finally, it bears mention that defendant's claim of prejudice is made in connection with the failure to give an instruction on the statutory mitigating circumstance that requires the jury to consider "Whether the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired." Suffice it to say that Dr. Parwatikar, who testified extensively at the Rule 29.15 hearing, made no attempt whatsoever to correlate his description of the symptoms of cocaine intoxication delirium and cocaine addiction to the defendant's, or any other addict's, capacity to appreciate the criminality of his conduct or to conform his conduct to

the requirements of law. Absent that correlation, the instruction should not be given.

In short, the majority has ignored or mischaracterized the penalty phase record in order to justify its conclusion that defendant was prejudiced. From a fair review of the record, Dr. Parwatikar's testimony does not give rise to a "reasonable probability" that the jury would have rejected the death penalty. For these reasons, I would affirm the judgment of conviction as well as the sentence of death.